**Donald L. DOBYNS, Mark Lee and Randall Eugene Bullock, Plaintiffs-Appellants,**

v.

**E-SYSTEMS, INC., Defendant-Appellee.**

No. 81-1051.

United States Court of Appeals, Fifth Circuit.

Feb. 18, 1982.

---

Arthur J. Brender, Fort Worth, Tex., for Dobyns.

Richard Anderson, Dallas, Tex., for Lee and Bullock.

Gardere, Wynne & Jaffe, Harold Hoffman, Dallas, Tex., for defendant-appellee.

Before THORNBERRY, TATE and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge.

Appellants, three former employees of appellee E-Systems, filed suit in district court alleging that their personal belongings had been searched and their employment terminated in violation of the First, Fourth, Fifth, Sixth, and Fourteenth Amendments of the United States Constitution. The district court dismissed the case for lack of federal jurisdiction on the ground that there was no state action[1] involved in E-Systems' allegedly unconstitutional activities.[2] We hold that there was state action and remand the case for a determination on the merits.

## I.

Appellee E-Systems is a private corporation headquartered in Greenville, Texas. In 1976, E-Systems entered into a contract with the United States undertaking to provide the "[n]ecessary personnel, materials, transportation, logistics, management, and services required to support the U.S. Sinai Field Mission." The Sinai Field Mission was to be the operational arm of the Sinai Support Mission, an entity created by Executive Order No. 11896 to implement the United States Proposal to construct and operate an early warning surveillance system in the Sinai Peninsula.[3]

---

1. Appellants actually contend, of course, that the governmental action at issue is "federal" as opposed to "state." Because the doctrine encompassing both concepts is commonly known as "state action," we use this term to refer to federal government action of significance in establishing the governmental involvement requisite for the assertion of constitutional rights.

2. Appellants also alleged § 28 U.S.C. §§ 1332, 1342, 2201, and 2202 as bases for federal juris-

diction. In this appeal, however, appellants contest only the court's ruling on state action as the basis for jurisdiction under 28 U.S.C. § 1331, and, in the alternative, the court's ruling on diversity, 28 U.S.C. § 1332. Accordingly, we will deal only with these issues.

3. The official name of the Proposal was United States Proposal for the Early Warning System in Sinai. Pub.L. 94–110, October 13, 1975, 89 Stat. 572.

Appellants Dobyns, Lee, and Bullock were E-Systems employees hired to act as security guards and firefighters for the Field Mission. Their constitutional claims arise out of separate but similar incidents.

In October 1976, Mr. Thorne, a State Department employee and Director of the Field Mission, was informed by an intelligence report that Bobby Sipes, a co-worker and roommate of Dobyns, was suspected of mailing hashish to the United States. Thorne contacted Mr. Pearcy, E-Systems' Program Manager, and told him of the report. The two agreed that Sipes should be confronted with the information and asked for his consent to a search of his quarters. Sipes was confronted, confessed to the crime, and agreed to the search. Pearcy sent another E-Systems' employee, Mr. Kapple, to organize and conduct a thorough search of Sipes' quarters. Kapple's men searched the entire quarters including a locked wall locker assigned to Dobyns. Dobyns was not present and had not consented to a search, nevertheless, the search team broke into his locker. No contraband was found.

When Dobyns learned of the search of his locker, he complained to Kapple and Pearcy. They apologized for their "error in judgment." Dobyns then wrote to his Congressman, B. F. Sisk, about the incident. Congressman Sisk became concerned and wrote to the State Department requesting an investigation and explanation. The State Department contacted E-Systems, who responded by characterizing the search as "inappropriate" and promising to formulate new search procedures for the future.

The next July, Dobyns requested a one year extension of his contract but the request was denied. Dobyns contends that extensions were customarily granted and that his was denied because of his complaints about the search.

Lee's and Bullock's claims arise out of another search and their subsequent terminations. On November 18, 1977, E-Systems employees entered the quarters shared by Lee and Bullock and announced that the two were suspected of possessing marijuana. The search of the quarters for marijuana was wholly negative, yet their employment was terminated immediately without a hearing or other opportunity to respond to the charges.

Dobyns, Lee, and Bullock sued E-Systems alleging the constitutional violations mentioned above as well as state law claims including breach of contract and libel and slander arising out of the same incidents. Appellants sought declaratory and injunctive relief and money damages.[4] All the claims were dismissed for lack of federal jurisdiction pursuant to E-Systems' motion for summary judgment. In this appeal, the appellants contend that the district court erred in finding no state action as a matter of law. In the alternative, appellant Dobyns requests that his claim be severed from those of Lee and Bullock because diversity exists between himself and E-Systems and thus forms a basis for federal jurisdiction of his state-based claims.

Summary judgment is appropriate only when there exist no genuine issues as to any material facts and one party is entitled to judgment as a matter of law. Fed.R. Civ.P. 56. Appellants contend that the district court should not have granted E-Systems' motion for summary judgment on the issue of state action because there were disputes as to material facts. We believe summary judgment was proper because the material facts were undisputed. Both parties recount the events giving rise to the claims in virtually identical terms. And both parties rely heavily upon the unambiguous language of the contract between E-Systems and the United States in their attempts to show that state action did or did not exist. Thus, the issue of whether there was state action as a matter of law was properly before the District Court. We hold, however, that the court was wrong in finding no state action. Having before us

---

4. The state law claims would be within the pendent jurisdiction of the federal court if the constitutional claims were established. *United*

*Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

the same undisputed facts, we hold that state action was present.

## II.

This case presents an almost unique factual situation. To the extent that prior case law identifies the existence or non-existence of state action in various circumstances, the cases present rather remote analogies. The doctrines emerging from those cases, however, guide our resolution of this case.

The leading case in defining the state action principle is *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). In that case, the Supreme Court indicated that whether state action exists in a particular situation can be determined "[o]nly by sifting facts and weighing circumstances...." *Id.* at 722, 81 S.Ct. at 860. "[T]o fashion and apply a precise formula for recognition of state responsibility... is an 'impossible task' which 'this Court has never attempted.'" *Ibid.* Indeed, twenty years after the decision in *Burton* there is still no precise test. Three lines of state action doctrine, however, have emerged from the many cases decided since *Burton.*

The first line evolved from the language of *Burton* and is commonly known as the "symbiotic relationship." It governs cases in which the government has "so far insinuated itself into a position of interdependence [with a private entity] that it must be recognized as a joint participant in the challenged activity...." *Burton,* 365 U.S. at 725, 81 S.Ct. at 862. In *Burton,* the Supreme Court found state action present in the refusal of a privately owned and operated restaurant to serve black customers. The restaurant leased its space in a publicly owned building managed by a municipal Parking Authority. Although the Parking Authority had nothing to do with the service policy of the restaurant, the Court found that the relationship between the two was one of "interdependence." *Ibid.* In so holding, the Court pointed to the public ownership of the land and building, their dedication to public uses, the physical and financial relationship between the Parking Authority and the restaurant, the upkeep of the restaurant by the Parking Authority, and other "mutual benefits" derived from the relationship. *Id.* at 724, 81 S.Ct. at 861. The Court concluded that the Parking Authority had placed "its power, property and prestige" behind the restaurant's discrimination and had become a joint participant in the discrimination. *Id.* at 725, 81 S.Ct. at 862.

A similar symbiotic relationship was found in *McQueen v. Druker*, 438 F.2d 781 (1st Cir. 1971). In that case the expulsion of a tenant from a privately owned apartment house was found to be state action. The apartment house was built under close supervision of the Federal Housing Authority as part of an urban renewal project. The land had been condemned by the city and then sold to the builder and owner of the apartment house. The government subsidized the mortgages and set standards of construction and limitations upon incomes of tenants. *See also, Hammond v. University of Tampa,* 344 F.2d 951 (5th Cir. 1965) (holding state action present in the admissions practices of a private university established largely through the use of surplus city buildings and other city land).

The second line of state action doctrine is known as the "public function" concept. It was explained most recently by the Supreme Court in *Flagg Brothers v. Brooks,* 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). In that case, the constitutionality of a New York statute authorizing the sale of stored goods by warehousemen was challenged as violative of the Due Process Clause of the Fourteenth Amendment. The plaintiff alleged that by enacting this statute, New York had delegated to warehousemen the function of resolving private disputes, a power "traditionally exclusively reserved to the State," thereby clothing them with state action. *Flagg Brothers,* 436 U.S. at 157, 98 S.Ct. at 1734, quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 352, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1974). The Court did not find state action, however. It noted that two branches of public

function theory had developed, one involving the delegation by the state of powers "traditionally exclusively reserved to the State," *see, e.g., Terry v. Adams*, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) (the holding of primary elections), and the other involving the assumption by private parties of governmental powers, *see, e.g., Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (the company-owned town). Finding New York's enactment of the statute to fall within neither branch, the Court concluded that there was no state action under the public function theory. *Flagg Brothers*, 436 U.S. at 157–164, 98 S.Ct. at 1734–1735.

A pertinent example of a finding of state action through a private organization carrying out a public function is our decision in *Robinson v. Price*, 553 F.2d 918 (5th Cir. 1977). Plaintiff in that case claimed a civil rights violation in his discharge as an employee of a private non-profit corporation fulfilling a welfare function by the expenditure of funds granted to it by the government. In finding state action, we noted the fact that the agency spent public funds and had public officials on its board. *See also, Smith v. YMCA of Montgomery, Inc.*, 462 F.2d 634 (5th Cir. 1972) (holding state action present in the activities of non-profit civic recreational organization utilizing city property, deriving funds from the city, and conducting city recreational programs).

A third line of state action doctrine inquires as to how heavily private enterprises and entities are regulated by the state. Under the test announced in *Jackson v. Metropolitan Edison Co., supra*, "the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself." 419 U.S. at 351. In *Jackson*, a customer of a privately owned and operated utility company alleged that the company had turned off her electricity without affording her due process of law. Although it was regulated extensively and had a monopoly in the community, the Court refused to find state action in the operation of the private utility company because the crucial factor—the nexus between the state and the allegedly unconstitutional activity—was absent. *See also Sims v. Jefferson Downs, Inc.*, 611 F.2d 609 (5th Cir. 1980) (state's extensive regulation of private racetrack does not give rise to state action). *Golden v. Biscayne Bay Yacht Club*, 530 F.2d 16 (5th Cir. 1976) (en banc), *cert. denied*, 429 U.S. 872, 97 S.Ct. 186, 50 L.Ed.2d 152 (1976) (existence of lease between city and private club does not create state action).

Having set out what we perceive to be the major lines of state action doctrine, we sift the facts and weigh the circumstances in the present case to determine whether there is state action involved.

## III.

■ Appellants urge that state action can be established under all three theories. They contend that the relationship between the United States and E-Systems is symbiotic, that E-Systems performs a public function, and that intense regulation establishes a nexus between the United States and the actions taken by E-Systems of which appellants complain. In support of their symbiosis and public function arguments, appellants emphasize the political activity and legislative history surrounding the creation of the Sinai Missions as well as various aspects of the contract between E-Systems and the United States. Having reviewed all the facts and circumstances, we conclude that their cumulative impact establishes the existence of state action under both the symbiosis and the public function theories. We express no opinion as to the merits of appellants' regulatory nexus argument since we find state action without need to apply this theory. Suffice it to say that the facts of this case are somewhat remote from the theory of state action arising out of government regulation of private enterprise. Further, in *Golden, supra*, we indicated that the court should look to the nexus test only after it is unable to find state action under other theories.

We begin our discussion with an examination of the inter-governmental political activity that led to the creation of the Sinai Support Mission, and ultimately to the Sinai Field Mission. We then describe the nature of those Missions.

After the October, 1973 war between Israel and Egypt, negotiation of a peace treaty began. On September 4, 1975, Israel and Egypt entered into an Agreement calling for the withdrawal of their respective military forces from certain parts of the Sinai Peninsula and the creation of a buffer zone to be occupied by the United Nations Emergency Force. Both parties realized that in order to insure compliance with the Agreement, a neutral party acceptable to both nations would have to become actively involved in the monitoring of military activity in the volatile Peninsula. That party, it was agreed, would be the United States.[5] On September 9, 1975, Israel and Egypt executed an Annex to the Agreement calling for the aerial surveillance of the subject area by the United States.

In conjunction with the signing of the Agreement, and at the request of the two nations, President Ford developed the United States Proposal for the operation of an early warning system in the Sinai Peninsula. The Proposal called for the construction, operation, and maintenance of three watch stations by up to 200 United States civilians who were not government employees. The personnel would monitor the equipment at all times and report any movement detected to Israel, Egypt, and the United Nations. Immunity from all local criminal, civil, tax, and customs laws was granted to all personnel. To insure that the operation would remain demilitarized, no arms of any kind, except small arms necessary to protect the civilians, would be kept at the stations. The Proposal was signed by the then Secretary of State Henry Kissinger and submitted to Congress for approval.

The legislative history of the Congressional approval of the Proposal reveals the nature of the operation and the concerns of Congress in approving it. *See generally* H.Rep.No. 94–532, 94th Cong. 1st Sess. 1 *reprinted in* [1975] U.S.Code Cong. & Ad. News 1050. Our nation had only recently gotten out of Viet Nam and the memories of our involvement in that foreign military action were strong and to some persons bitter. Some Congressmen were afraid that our participation would lead to another Viet Nam, and they viewed the Proposal as another Gulf of Tonkin resolution. H.Rep., *supra* at 29. That the personnel would be civilians privately employed was seen to be somewhat reassuring because those requirements excluded CIA agents or other governmental employees who might otherwise be assigned to the operation. H.Rep., *supra* at 17. Ultimately, Congress recognized the importance of an "American presence," H.Rep., *supra* at 3, and approved the Proposal. It was made abundantly clear, however, that the civilians would "have no military function. They [would] be in the Sinai in a peacekeeping role exactly the same as that of the United Nations Force." H.Rep., *supra* at 13, U.S.Code Cong. & Admin.News 1975, p. 1062.

On January 13, 1976, President Ford issued Executive Order No. 11896 establishing the United States Sinai Support Mission. The Mission was designated as the entity that would carry out the duties and responsibilities of the United States government in implementing the Proposal. At the head of the Mission there was a Director, a government employee appointed by the President. He was given the authority to enter into whatever contracts would be necessary to implement the Mission. The application of various statutes governing federal contracts was suspended with regard to Mission contracts. In addition, contractors were indemnified against the unusually

---

**5.** As one Congressman pointed out, United States technicians were chosen for the operation, not for their special skills or knowledge of surveillance, but for political reasons. Israel and Egypt could find no other party acceptable

to them both to fill this sensitive position. H.Rep.No. 94–532, 94th Cong. 1st Sess. at 25 *reprinted in* [1975] U.S.Code Cong. & Ad.News 1050, 1072.

hazardous risks attendant to the Mission. Pursuant to this authority, the Sinai Support Mission entered into a contract with E-Systems under which the Sinai Field Mission was created.

The contract between the United States and E-Systems carried forward the purposes of the Proposal and the Sinai Support Mission. An examination of that contract shows that through it the United States delegated its peacekeeping function in the Sinai Peninsula to E-Systems and that the relationship between the two parties was one of interdependence and symbiosis.

The original contract between the United States and E-Systems was executed on June 16, 1976. The cover page stated that the contract was for "[n]ecessary personnel, materials, transportation, logistics, management, and services required to support the U.S. Sinai Field Mission." Thus, from the outset, it was apparent that E-Systems was in turn providing essential and extensive services to the Sinai Support Mission.

Article I of the contract set out the goals of the Mission, its importance in the peace process, and the dominant part E-Systems was to play in the Mission. E-Systems was responsible for the installation, operation, maintenance, and support of the early warning surveillance system and the reporting of all data received from the system to Israel and Egypt. Because of its central role in the Mission, E-Systems was obliged to establish a "working relationship" with the Israeli and Egyptian embassies.[6]

Article III of the contract regulated the conduct of Field Mission personnel. It stressed the importance of maintaining confidence in the Israeli-Eyptian Agreement by avoiding misconduct on the part of the employees. "The accomplishment of the objectives... requires a degree of circumspection on the part of the SFM personnel

which would not be necessary under normal circumstances." Because of the unique circumstances, the United States retained the right to "use reasonable force and detain or to restrain employees." Virtually all government contracts require that the contractor's employees maintain the standards of conduct required of federal employees; however, as counsel for E-Systems conceded at oral argument, retention by the government of the right to discipline the contractor's employees is quite unusual.

Article VII immunized the employees from all local criminal, civil, tax, and custom laws, but reserved to the United States the right to dissolve that immunity.

We believe the development of the Sinai Field Mission as described establishes the existence of state action under both the public function and symbiosis theories. We have reviewed carefully the legislative and executive activity surrounding the creation of the Mission as well as the lengthy contract between E-Systems and the government. From this evaluation we discern compelling factors which lead us to conclude that there is state action.

### A. Public Function

We find that E-Systems' role in the Sinai Peninsula was that of a peacekeeper, a function which undoubtedly is "traditionally exclusively reserved to the State." *Jackson*, 419 U.S. at 352, 95 S.Ct. at 454. By enacting the Proposal, Congress obligated the United States to fulfill a peacekeeping role in the Sinai. The legislative history shows that while Congress wanted to accommodate Israel and Egypt in their request for a United States-operated early warning system, it was wary of the consequences that might result from the use of government or military personnel. The solution, then, was to contract with a private entity for the construction, operation, and maintenance of the early warning system.

---

**6.** In addition to its duties regarding the surveillance system, E-Systems was obligated to construct and maintain all the facilities necessary to accommodate its personnel including lodgings, roads, sewer systems, medical centers, fire and weather stations, recreational facilities, and an elaborate communications system within the complex. The extent of this obligation calls to mind the company town in *Marsh v. Alabama, supra*. While we note the similarities, our finding of state action is not based in substantial measure on these factors. We withhold any opinion as to whether the broad extent of these physical facilities could support a finding of state action in this particular situation.

Ironically, E-Systems plays down its importance to the Mission in characterizing its role. The company would have us believe that it was an ordinary contractor providing ordinary services. However, if the legislative history does not make clear the importance of E-Systems in the peace process, the contract between the company and the government certainly does. The scope of work as defined by the contract requires E-Systems to participate in surveillance activities. Military surveillance such as this is a sovereign function, and without governmental authorization, E-Systems could not have engaged in this activity. E-Systems argues that because it merely reports the data and is not permitted to act upon the information, it is not engaged in peacekeeping. This contention is without merit. The sole obligation of the United States regarding surveillance was to report to Israel, Egypt, and the United Nations whatever data was received. E-Systems performed that function entirely. That the United States did not have a larger obligation to delegate to the company does not defeat the conclusion that there is state action.

The central role of E-Systems in the Mission is further emphasized by the fact that it was required by the contract to establish working relationships with the Israeli and Egyptian embassies. This, too, illustrates the prominence of the company in the peacekeeping Mission.

The searches conducted by E-Systems indicate the assumption of a police activity which is clearly a public function. It is useful to call up as an analogy, albeit on a much less comprehensive scope, the now well established scrutinizing and searching of travelers' luggage by private airline employees. This activity is another demonstration of the application of the public function theory. The cases hold that since such functions are carried out under the authorization of the 1974 Air Transportation Security Act, 49 U.S.C. § 1511(a) and (b), to protect against hijacking, the

searches involve state action. *U.S. v. Davis,* 482 F.2d 893 (9th Cir. 1973). *See also U.S. v. Gumerlock,* 590 F.2d 794, 796 (9th Cir. 1979), *cert. denied,* 441 U.S. 948, 99 S.Ct. 2173, 60 L.Ed.2d 1052 (1979).[7]

It surely can be said that the search of the employees' rooms and wall lockers in the principal case involved a much deeper governmental activity than that involved in the routine airline security measures taken by airline employees. In the principal case, E-Systems was fulfilling a full governmental function. The private contract was set up solely to avoid a U.S. military or governmental employee presence in the area. As to the *specific* search of Dobyns' quarters, it was instigated by the Director of the Support Mission, a governmental employee agreeing with the E-Systems Field Mission manager that a search should be undertaken. In the search of the Lee and Bullock quarters, there was no objection to the search. They object only to their discharge after the search was negative.

We find that the United States delegated to E-Systems a broad governmental role including a peacekeeping role. In doing so the company became obligated to act within constitutional bounds as it carried out this public function.

### B. Symbiosis

Although the United States delegated a broad governmental role including a peacekeeping function to E-Systems, it did not totally divest itself of any interest in or responsibility for the Field Mission. The Sinai Support Mission, an arm of the State Department, was ultimately responsible for the Field Mission on behalf of the government. State Department personnel remained in the Sinai and worked along with E-Systems personnel in the operation of the Field Mission. The relationship between the government and E-Systems can be characterized as one of close interdependence. The interdependence of E-Systems and the United States is seen in the contract, but also in the events following the search of appellant Dobyns' locker.

**7.** In contrast, searches of missent luggage by airline personnel for identification purposes do not involve state action. *See U.S. v. DeLa-* *Fuente,* 548 F.2d 528, 540 (5th Cir. 1977), *cert. denied,* 431 U.S. 932, 97 S.Ct. 2640, 53 L.Ed.2d 249 (1977).

The contract granted immunity from all local laws to E-Systems personnel. This indicates the acceptance by the United States of responsibility for setting the legal standards by which the personnel would live. The government also agreed to indemnify E-Systems for harm that might result from the "unusually hazardous risks" attendant to the Mission. This, too, indicates an acceptance of responsibility for E-Systems.

The most telling contract clause evidencing interdependence between E-Systems and the government, however, is the retention by the government of the right to discipline E-Systems' employees. This is most unusual in a government contract, as counsel for E-Systems admitted, but was necessary here because of the highly sensitive nature of the Mission. The active involvement of the government in personnel discipline can be seen by examining the events following the search of Dobyns' locker. After the search, Dobyns contacted Congressman Sisk who contacted the State Department, and a thorough investigation was undertaken. The fact that an investigation was conducted and that E-Systems subsequently promised to improve its search procedures and coordinate them with the State Department is evidence of the close relationship between E-Systems and the United States. The two must be recognized as joint participants, *Burton*, 365 U.S. at 725, 81 S.Ct. at 862; in the Missions, thereby making the actions of one fairly attributable to the other. *Jackson*, 419 U.S. at 351, 95 S.Ct. at 453. The requisite symbiotic relationship is established.

E-Systems contends that a finding of state action in this case would render all government contractors, especially those performing services overseas, subject to the state action doctrine. Our holding here is far narrower. Our finding of state action is based upon the nature of the duties performed by E-Systems and the interdependent relationship between E-Systems and the government. The mere existence of a contract between them is insufficient to create state action. Because the contract delegates a public function to E-Systems, however, state action is present. *Flagg Brothers*, 436 U.S. at 157, 98 S.Ct. at 1734; *Jackson*, 419 U.S. at 352, 95 S.Ct. at 454; *Greco v. Orange Memorial Hospital Corp.*, 513 F.2d 873, 881–82 (5th Cir. 1975) (en banc), *cert. denied*, 423 U.S. 1000, 96 S.Ct. 433, 46 L.Ed.2d 376 (1975). Here, the United States has delegated its peace-keeping function, a power "traditionally exclusively reserved to the State," *Flagg Brothers*, 436 U.S. at 157, 98 S.Ct. at 1734; *Jackson*, 419 U.S. at 352, 95 S.Ct. at 454, to E-Systems. Private fulfillment of such a governmental role constitutes state action.

■ Likewise, the overseas performance of a contract, standing alone, cannot be the basis of state action. Were E-Systems, for instance, constructing an embassy building in a foreign country, that factor alone would not subject it to the state action doctrine. On the other hand, if the company were performing a similar extensive function in the United States, state action could be present if the closeness of the relationship dictated that result.[8] Thus, our holding is not intended in any sense to mean that state action exists every time the government contracts for the performance of services in a foreign country. As we noted above, whether state action exists depends on the facts and circumstances of each case. The existence of a contract and its place of performance are only two of the many considerations present in this case. Standing alone, these two factors would not prove state action by an overseas government contractor. In the present case, there is a far stronger governmental aspect to

---

8. *See Holodnak v. Avco Corp., Avco-Lycoming Division, Stratford*, 514 F.2d 285 (2d Cir. 1975), *cert. denied*, 423 U.S. 892, 96 S.Ct. 188, 46 L.Ed.2d 123 (1975) in which the court found state action present in activities of a private company which contracted exclusively with the Department of Defense. The government owned the land, buildings, and most of the equipment used by the company; the manufactured goods were shipped under government bills of lading; and Defense officials oversaw production. The court found that their relationship was one of interdependence from which both parties derived mutual benefits.

**1228**

E-Systems activity which leads to the conclusion that there is state action. We cannot close our eyes to the overriding fact that pragmatically E-Systems was the United States Government's operating presence in the Sinai. To find E-Systems to be merely a government contractor would forsake reality.

We hold that the requisite state action was present. Appellants may bring their constitutional claims against E-Systems. Because we find that state action posits federal jurisdiction, we need not reach appellant Dobyns' arguments concerning the severance of his claim. The judgment is reversed and the cause remanded to the district court for trial upon the merits of appellants' claims.

REVERSED AND REMANDED.