**ACCUBANC MORTGAGE CORPORATION,**
Appellant,

v.

**Richard DRUMMONDS, Appellee.**

No. 2–95–072–CV.

Court of Appeals of Texas,
Fort Worth.

Dec. 19, 1996.

Rehearing Overruled Feb. 27, 1997.

Brown, McCarroll & Oaks Hartline, Peter J. Harry and Kathy J. Owen, Dallas, for appellant.

Hill, Gilstrap, Moorhead, White, Bodoin & Webster, Frank Gilstrap, Ann E. Jones and John M. Rogers, Arlington, for appellee.

Before DAUPHINOT, RICHARDS and HOLMAN, JJ.

## OPINION

RICHARDS, Justice.

Appellant AccuBanc Mortgage Corporation (AccuBanc), a mortgage banking company, appeals from a $9.1 million judgment on a jury verdict for Appellee Richard Drummonds. We affirm in part and reverse and render in part.

This case presents several complicated questions, including: (1) whether a wrongful discharge claim against the asset of a federally regulated thrift is governed by FIRREA's administrative claims procedure; (2) whether such a claim must be brought under the FTCA; (3) what constitutes an employment contract; (4) whether a *Bivens* action is available against the asset of a federally regulated thrift when the thrift is in receivership; and (5) what constitutes self-publication of defamatory statements. In twenty-five points of error, AccuBanc contends the

trial court's rulings and judgment on these and other issues are improper.

## THE JURISDICTIONAL ISSUES

In its first point of error, AccuBanc asserts the trial court lacked subject matter jurisdiction over Drummonds' causes of action because Drummonds failed to satisfy the administrative prerequisites of the Financial Institutions Reform, Recovery, and Enforcement Act, 12 U.S.C. §§ 1811–35a (West 1989 & West Supp. Pamph. 1996) (FIRREA) and the Federal Tort Claims Act, 28 U.S.C. §§ 2671–80 (West 1994) (the FTCA).

We hold that Drummonds was not required to satisfy the administrative prerequisites of either FIRREA or the FTCA because those statutory schemes do not apply to his claims.

### 1. FIRREA

FIRREA sets up a detailed framework for restoring the financial integrity of the federal deposit insurance fund, providing funds from public and private sources to deal expeditiously with failed depository institutions. *In re Scott,* 157 B.R. 297, 308 (Bankr.W.D.Tex. 1993), *op. withdrawn due to settlement,* 162 B.R. 1004 (Bankr.W.D.Tex.1994); *see also Circle Indus. v. City Fed. Svgs. Bank,* 749 F.Supp. 447, 451 (E.D.N.Y.1990), *aff'd,* 931 F.2d 7 (2d Cir.1991). FIRREA includes an administrative claims procedure for resolving claims asserted against both failed depository institutions and the RTC in its capacity as receiver of failed depository institutions. 12 U.S.C. § 1821(d)(3)(B)(i), (d)(5), (d)(6) (West 1989 & West Supp. Pamph.1996); *RTC v. Elman,* 949 F.2d 624, 627 (2d Cir.1991); *In re Scott,* 157 B.R. at 308 & n. 6. If the creditor-claimant does not satisfy these administrative prerequisites, he deprives the trial court of subject matter jurisdiction over: (1) any claim from the assets of a depository institution for which the RTC has been appointed a receiver; or (2) any claim relating to any act or omission of the RTC as receiver. 12 U.S.C. § 1821(d)(13)(D) (West 1989).

In this case, Drummonds, the former president and CEO of AccuBanc, sued the company because he was fired by its RTC-controlled board of directors. AccuBanc was a wholly owned subsidiary of El Paso Federal Savings and Loan Association (El Paso Savings), a depository institution. At the time Drummonds was discharged, El Paso Savings had failed and had been placed under the receivership of the RTC. Although AccuBanc was an asset of a depository institution, it was not itself a depository institution; it made and serviced loans, but it did not take deposits from the public. *Id.* § 1813(c) (West 1989). In addition, AccuBanc did not fail; it remained a viable entity. None of Drummonds' claims is against El Paso Savings, nor do any of them concern the RTC's actions with respect to a claim against El Paso Savings. Instead, Drummonds has alleged claims against AccuBanc.

AccuBanc contends that Drummonds was required to satisfy FIRREA's administrative prerequisites because (1) he asserted his claims against the asset of a depository institution for which the RTC had been appointed a receiver—AccuBanc; and (2) his claims related to the RTC's acts as receiver. AccuBanc argues that section 1821(d)(13)(D) operates as a jurisdictional bar to *any* claim asserted against the assets of a failed depository institution, irrespective of whether the claimant is asserting a claim against the failed depository institution itself.

We think such a reading of the statute is too broad. In cases of statutory interpretation, we look to the plain and common meaning of the terms and words used in the statute as a whole, to give effect to the legislature's intent. *Monsanto Co. v. Cornerstones Mun. Util. Dist.,* 865 S.W.2d 937, 939 (Tex.1993); *ESIS, Inc. v. Johnson,* 908 S.W.2d 554, 560 (Tex.App.—Fort Worth 1995, writ denied); *see also Whatley v. RTC,* 32 F.3d 905, 909 (5th Cir.1994) (interpreting FIRREA). Read as a whole, FIRREA repeatedly refers to the claims process only as it relates to creditors of failed depository institutions. In fact, the jurisdictional bar of section 1821(d)(13)(D) can be interpreted as applying to Drummonds' claims only if it is read in a vacuum, completely apart from the rest of the administrative scheme. We will not adopt such a tortuous interpretation of section 1821(d).

■ Further, the interpretation Accu-Banc urges would not accomplish FIRREA's purposes. The primary purpose of FIRREA is to establish a scheme for fairly adjudicating creditor claims against *failed* financial institutions. *Whatley,* 32 F.3d at 909–10. Barring Drummonds' claims against Accu-Banc, a solvent company, would not affect the fair adjudication of creditor claims against El Paso Savings, the failed depository institution.

Because Drummonds has not asserted any claims against a failed depository institution, we hold he did not have to satisfy FIRREA's administrative prerequisites before filing suit against AccuBanc.

### 2. The FTCA

Also in point of error one, AccuBanc contends the trial court lacked subject matter jurisdiction over Drummonds' claims because he failed to pursue administrative remedies under the FTCA.

■ The federal government has used the FTCA to waive its sovereign immunity to suits based on certain torts committed by government employees in the course and scope of their employment. 28 U.S.C. §§ 2672, 2674. The FTCA is applicable to the RTC. *Rauscher Pierce Refsnes, Inc. v. FDIC,* 789 F.2d 313, 315 (5th Cir.1986); *Park Club, Inc. v. RTC,* 742 F.Supp. 395, 398 (S.D.Tex.1990), *rev'd on other grounds,* 967 F.2d 1053 (5th Cir.1992). A person who wishes to sue under the FTCA must first exhaust his administrative remedies by presenting his claim to the appropriate federal agency. 28 U.S.C. § 2675(a). Moreover, the United States is the proper defendant in FTCA suits; neither the federal agency nor the federal employee involved can be sued in their own names. *Vernell v. U.S. Postal Serv.,* 819 F.2d 108, 109 (5th Cir.1987). Finally, the federal district courts have exclusive jurisdiction over FTCA suits. 28 U.S.C. § 1346(b).

AccuBanc asserts Drummonds' tort claims fall under the FTCA because all the acts underlying his suit were committed by RTC employees in the course and scope of their employment for the United States Government. Thus, AccuBanc reasons, the United States is the proper defendant in this case, and Drummonds was required to file an administrative charge with the appropriate federal agency before suing AccuBanc.

Drummonds has alleged that, at all times material to this case, AccuBanc was owned or controlled by the RTC and that all the acts underlying his suit were committed by RTC employees. Nonetheless, Drummonds contends that none of his claims is covered by the FTCA because he did not sue the RTC or any federal employees. We agree.

■ The issue we must decide is not whether the United States is the proper defendant in an FTCA case. Rather, the issue is whether a plaintiff *must* sue under the FTCA when the conduct of which he complains was committed by federal employees in their dual capacity as U.S. employees and directors of a private corporation.

The record shows that, before Drummonds was fired, El Paso Savings had ceased to exist, and the RTC had taken over complete control of AccuBanc. Further, AccuBanc's board of directors was comprised entirely of RTC employees: Dan Crain, Chris Roach, and Richard Bodak. Drummonds' employment was terminated by Crain, Roach, and Bodak in the course and scope of their employment for the RTC. Nonetheless, when they committed these acts, Crain, Roach, and Bodak were performing dual roles; they were at the same time federal employees and directors of AccuBanc. Drummonds has chosen to sue AccuBanc, a private corporation, for the actions taken by its board of directors, rather than to sue the RTC for its employees' conduct, or to sue Crain, Roach, and Bodak individually.

Generally, the actions of a corporate agent made on behalf of the corporation are deemed the corporation's acts. *Holloway v. Skinner,* 898 S.W.2d 793, 795 (Tex.1995); *see also Duval County Ranch Co. v. Wooldridge,* 674 S.W.2d 332, 335 (Tex.App.—Austin 1984, no writ) (defendant's fraud was attributable to corporation for which he was acting and of which he was sole owner). Even though Crain, Roach, and Bodak were RTC employees, as directors of AccuBanc, they had au-

thority under state law to bind AccuBanc to the consequences of their decisions.

AccuBanc does not cite any cases that have held a plaintiff *must* sue the United States when the conduct of federal employees—who are also directors of a private corporation—is the basis for the plaintiff's claims. Our painstaking research has not unearthed any such cases. Thus, we conclude that, under the unique circumstances presented in this situation, Drummonds was entitled to sue AccuBanc under state law rather than the United States under federal law.[1]

We overrule point of error one.

### BREACH OF CONTRACT

In points of error three and seven, Accu-Banc contends the trial court abused its discretion by submitting Questions 1, 2, and 3 to the jury and by rendering judgment for Drummonds on the breach of contract issue because the evidence is legally and factually insufficient to establish that Drummonds' election as an officer for twelve months at a salary of $177,100 constituted an employment agreement.[2] We hold that the trial court's rulings regarding the breach of contract issues were proper because the evidence is legally and factually sufficient to establish a twelve-month employment contract.

 In determining a "no evidence" point, we are to consider only the evidence and inferences that tend to support the jury's findings and disregard all evidence and inferences to the contrary. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994); *In re King's*

*Estate*, 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951). If there is more than a scintilla of evidence to support the finding, the claim is sufficient as a matter of law, and any challenges go merely to the weight to be accorded the evidence. *Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex.1993).

 An assertion that the evidence is "insufficient" to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the jury's answer should be set aside and a new trial ordered. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). We are required to consider all of the evidence in the case in making this determination. *Jaffe Aircraft Corp. v. Carr*, 867 S.W.2d 27, 29 (Tex.1993).

Questions 1, 2, and 3 asked the jury:

**QUESTION NO. 1:**

Did AccuBanc agree to employ Mr. Drummonds on July 29, 1992 for 12 months subject to earlier removal for "good cause?"

. . . .

**QUESTION NO. 2:**

Did AccuBanc fail to comply with the agreement?

. . . .

**QUESTION NO. 3:**

What amount of money, if paid now in cash, would reasonably compensate Mr. Drummonds for his damages, if any, resulting from the failure to comply?

---

1. As previously noted, Drummonds has alleged in his pleadings that, "at all times material [to this lawsuit], AccuBanc was owned and/or controlled by the RTC, an agency of the U.S. Government." The FTCA provides that a "federal agency" includes "corporations primarily acting as instrumentalities or agencies of the United States...." 28 U.S.C. § 2671. In addition, a person is a federal employee if the person is under the day-to-day control of the U.S. Government. *United States v. Orleans*, 425 U.S. 807, 815, 96 S.Ct. 1971, 1976, 48 L.Ed.2d 390, 398 (1976). A "person" includes a private employer whose business operations are controlled by the government. *See B & A Marine Co. v. American Foreign Shipping Co.*, 23 F.3d 709, 713 (2d Cir.), *cert. denied*, — U.S. ——, 115 S.Ct. 421, 130 L.Ed.2d 336 (1994). Despite Drummonds' allegation and the relevant law, however, AccuBanc

does not argue that it was a federal agency within the scope of section 2671. Thus, we do not consider whether Drummonds was actually suing a federal agency or employee when it sued AccuBanc.

2. AccuBanc also contends that, as a matter of law, Drummonds' re-election as an officer did not constitute an employment agreement. Because Drummonds had the burden of proving the existence of an employment contract, we construe the point as asserting there is no evidence, i.e., legally insufficient evidence, to support the jury's findings. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983); *Marshall v. Superior Heat Treating Co.*, 826 S.W.2d 197, 199 (Tex. App.—Fort Worth 1992, no writ).

Answer in Dollars and Cents.

Answer: *$152,000.00*

▮ In Texas, the employment relationship is generally at will—subject to termination at any time for any reason or no reason. *Mott v. Montgomery County,* 882 S.W.2d 635, 637 (Tex.App.—Beaumont 1994, writ denied); *Currey v. Lone Star Steel Co.,* 676 S.W.2d 205, 212 (Tex.App.—Fort Worth 1984, no writ). Thus, a discharged employee like Drummonds, who asserts the parties have contractually agreed to limit the employer's right to terminate at will, has the burden of proving an express agreement or written representation to that effect. *Lee–Wright, Inc. v. Hall,* 840 S.W.2d 572, 577 (Tex.App.—Houston [1st Dist.] 1992, no writ); *Totman v. Control Data Corp.,* 707 S.W.2d 739, 744 (Tex.App.—Fort Worth 1986, no writ) (op. on reh'g).

The contract must, in a meaningful and special way, limit the employer's right to terminate at will. *Benoit v. Polysar Gulf Coast, Inc.,* 728 S.W.2d 403, 406 (Tex.App.—Beaumont 1987, writ ref'd n.r.e.). One such limitation is a hiring based on an agreement of an annual salary. This type of hiring is definite employment for the period named. *Winograd v. Willis,* 789 S.W.2d 307, 310 (Tex.App.—Houston [14th Dist.] 1990, writ denied); *Dallas Hotel Co. v. Lackey,* 203 S.W.2d 557, 561 (Tex.Civ.App.—Dallas 1947, writ ref'd n.r.e.). Once the parties have agreed to a term of service, the employee cannot be fired except for good cause. *Lee–Wright,* 840 S.W.2d at 577–78.

▮ In this case, at a board of directors meeting on July 29, 1992, AccuBanc approved Drummonds' re-election as president and CEO for twelve months. Also at the July 1992 meeting, the board of directors approved Drummonds' annual salary of $177,100 per year. This is some evidence to support the jury's finding that AccuBanc employed Drummonds for a twelve-month term, subject only to removal for good cause.

There is also some evidence that Drummonds' employment relationship was at will. For instance, AccuBanc's corporate bylaws provide that "[e]ach officer of the corporation shall hold office until his successor is chosen and qualifies, or until his death or removal or resignation from office." Drummonds was aware of this provision on July 29, 1992. Further, AccuBanc's corporate records indicate it was the company's practice to elect officers "to serve until the next annual meeting of the Board of Directors or until their earlier death, resignation, disqualification, or removal from office[.]" While AccuBanc's written documents do not indicate the elections were for a specific term, Drummonds testified he understood the board of directors' discussion of the action they took on July 29, 1992 to mean he was being rehired for twelve months, subject only to removal for good cause.

Indeed, there is a conflict between the transcript of the July 29, 1992 meeting and AccuBanc's minutes from that meeting. AccuBanc's minutes contain the following resolution:

> RESOLVED, that the officers be elected ... to serve for the next twelve months or until such time as his or her successor is chosen and qualifies, or until his or her death or removal or resignation from office.

The transcript, on the other hand, reflects that AccuBanc's board of directors orally agreed to approve a slate of officers—including Drummonds—*and their salaries for the next twelve months,* rather than for an indefinite period. Resolution of this conflict lay within the exclusive province of the jury. *Bellefonte Underwriters Ins. Co. v. Brown,* 704 S.W.2d 742, 744–45 (Tex.1986).

There is also a conflict in Drummonds' testimony. At his deposition, Drummonds testified that he did not have an employment agreement with AccuBanc for a set term of one, two, or five years. When impeached with this testimony at trial, however, he said, "I guess I had forgotten that" and insisted he'd believed he had a twelve-month contract with AccuBanc. Drummonds' conflicting testimony does not conclusively negate the existence of a contract; rather, it raises a fact issue to be resolved by the jury. *Randall v. Dallas Power & Light Co.,* 752 S.W.2d 4, 5 (Tex.1988); *Molnar v. Engels, Inc.,* 705 S.W.2d 224, 226 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.); *see also Mendoza v.*

*Fidelity & Guar. Ins. Underwriters,* 606 S.W.2d 692, 694 (Tex.1980) (a party's testimonial declarations that are contrary to his position are not conclusive of the matter but are quasi-admissions and merely some evidence to be weighed by the fact finder).

Also at the July 1992 meeting, Dan Crain, an RTC employee and chairman of Accu-Banc's board of directors, advised those in attendance that the RTC would expect Accu-Banc's officers to resign their positions when AccuBanc was sold to Merit Investment Corporation (Merit). Drummonds also testified that, if AccuBanc was sold to Merit, he expected his employment to be terminated *by Merit;* however, based on his past experience with a financial institution buy-out, he expected some sort of settlement of his employment contract.

We hold the evidence of an employment contract is not so weak, or the evidence to the contrary so overwhelming, that the jury's answers to Questions 1, 2, and 3 should be set aside and a new trial ordered. *Garza,* 395 S.W.2d at 823.

AccuBanc also relies on its written employment policies, several of which state that the company's employment relationship with its employees is generally at will. However, AccuBanc's termination of employment policy provides:

> It is the policy of the Corporation to terminate employment because of an employee's resignation, discharge, retirement, or as a result of a permanent reduction in the work force. Discharge can be for any reason not prohibited by law. *In the absence of a specific agreement,* employees are free to resign at any time, and the Corporation reserves the right to terminate employment for any reason. [Emphasis added.]

As we have previously noted, the evidence is sufficient to support the jury's finding that AccuBanc and Drummonds had a specific agreement that AccuBanc would not terminate Drummonds except for good cause. Thus, AccuBanc's termination policy is not evidence of an at-will relationship in this case.

AccuBanc also contends the evidence raises an issue concerning whether the parties had a meeting of the minds about the material issues of the contract. This argument is beside the point. The evidence is undisputed that, at the July 1992 meeting, AccuBanc's board of directors approved Drummonds' re-election for twelve months at a salary of $177,100. Thus, the parties' minds were in agreement about these issues. No further meeting of the minds is necessary because, when the parties have agreed to a term of service under these circumstances, the law presumes the employee cannot be fired except for good cause. *Lee–Wright,* 840 S.W.2d at 577.

Because the evidence is legally and factually sufficient to establish that AccuBanc agreed not to terminate Drummonds for twelve months except for good cause, we overrule points of error three and seven.

## CONSTITUTIONAL TORT CLAIMS

In point of error eight, AccuBanc asserts the trial court erred in submitting Questions 4, 5, 7, and 8 and most of their accompanying instructions to the jury because these questions and instructions misstate the law as to whether AccuBanc, a private corporation, can commit a constitutional tort. We hold that Drummonds cannot assert against AccuBanc a cause of action for damages for violation of his constitutional rights. Accordingly, the trial court should not have submitted Questions 4, 5, 7, and 8 and their accompanying instructions to the jury.

In his Fifth Amended Petition, Drummonds alleged that AccuBanc violated his rights to free speech and due process under both the federal and state constitutions.

Questions 4, 5, 7, 8, and their pertinent accompanying instructions read as follows:

> A property interest can be an agreement or contract, or an understanding that supports a claim of a right to continued employment.

> A property interest can also be a limit imposed by law on the right to terminate an employee.

**QUESTION NO. 4:**

Did Mr. Drummonds have a property interest in continued employment with AccuBanc as of August 7, 1992 [the date his employment was terminated]?

. . . .

The right to pursue a chosen profession without governmental interference is a "liberty interest."

A liberty interest also includes freedom from an employer's making public any false and stigmatizing charge against an employee which is likely to substantially foreclose the employee's ability to follow his chosen profession.

**QUESTION NO. 5:**

Did AccuBanc deprive Mr. Drummonds of a liberty interest?

. . . .

If AccuBanc terminated Mr. Drummonds for doing something which was lawful and about which AccuBanc had not forewarned Mr. Drummonds, then AccuBanc deprived Mr. Drummonds of substantive due process.

**QUESTION NO. 7:**

Did AccuBanc deprive Mr. Drummonds of substantive due process?

. . . .

If you have answered "yes" to Question No. 4 or [to] Question No. 5, and you find that AccuBanc failed to provide Mr. Drummonds notice and a fair hearing regarding his termination, then AccuBanc violated Mr. Drummonds' constitutional rights of procedural due process.

**QUESTION NO. 8:**

What amount of money will fairly compensate Mr. Drummonds for the deprivation of his constitutional right of procedural due process?

. . . .

### 1. Federal Constitutional Tort Claims

▮▮▮▮ A tort action for damages for violation of federal constitutional rights is known as a *Bivens* action. In *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the United States Supreme Court held that the Fourth Amendment implies such a right of action against a federal official. *Id.* at 396–97, 91 S.Ct. at 2004–05, 29 L.Ed.2d at 626–27. Notably, however, the United States Supreme Court has unanimously held that a federal *agency*—even one as to which Congress has waived sovereign immunity—is not subject to liability for damages under *Bivens*. *FDIC v. Meyer*, 510 U.S. 471, 486, 114 S.Ct. 996, 1005–06, 127 L.Ed.2d 308, 323 (1994). Thus, *Bivens* actions may only be asserted against federal agents; they cannot be asserted against federal agencies. Id. *Meyer's* reasoning has since been extended to preclude *Bivens* actions against private companies. In *Kauffman v. Anglo–American Sch. of Sofia*, 28 F.3d 1223 (D.C.Cir.1994), the D.C. Circuit held that an entity that is not a federal agency, but is constrained by the Constitution in some or all of its acts solely because of *lesser* links to the federal government, is equally exempt from *Bivens* liability. *Id.* at 1224.

▮▮▮▮ Despite the *Meyer* and *Kauffman* decisions, Drummonds contends "[t]he overwhelming consensus among federal courts is to allow private corporations to be liable under *Bivens*." All of the cases on which Drummonds relies were decided well before *Meyer*. See *Schowengerdt v. General Dynamics Corp.*, 823 F.2d 1328, 1337–38 (9th Cir.1987); *Reuber v. United States*, 750 F.2d 1039, 1053–60 (D.C.Cir.1984); *Dobyns v. E–Systems, Inc.*, 667 F.2d 1219, 1221 (5th Cir. 1982); *Yiamouyiannis v. Chemical Abstracts Serv.*, 521 F.2d 1392, 1393 (6th Cir.1975) (per curiam); *Holodnak v. Avco Corp.*, 514 F.2d 285, 289–90 (2d Cir.), *cert. denied*, 423 U.S. 892, 96 S.Ct. 188, 46 L.Ed.2d 123 (1975). Moreover, analogizing from section 1983[3]

**3.** An injured party may sue under 42 U.S.C. § 1983 (West 1994) for deprivation of a federal constitutional right if the alleged wrongdoer acted under color of state—not federal—law. *See id.* Section 1983 actions may be brought against both individuals and private companies. *See Dennis v. Sparks*, 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980) (section 1983 action against both private company and individuals); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (section 1983 action against private company); *Howerton v. Gabica*, 708 F.2d 380 (9th Cir.1983) (section 1983 action against individual).

claims, the courts in these cases merely assumed, without analysis, that private entities were no less susceptible to *Bivens* actions than were private individuals. Thus, the cases centered entirely around whether the private party defendants involved had engaged in "state action."[4] *See Schowengerdt*, 823 F.2d at 1337–38; *Reuber*, 750 F.2d at 1054 & n. 19, 1057; *Dobyns*, 667 F.2d at 1221–23; *Yiamouyiannis*, 521 F.2d at 1393; *Holodnak*, 514 F.2d at 289–90. We also note that, since *Meyer* was decided, the D.C. Circuit has reversed its holding in the *Reuber* case, expressly stating that *Reuber* "does not survive *Meyer*" for purposes of *Bivens* actions. *Kauffman*, 28 F.3d at 1226.

The part of the *Meyer* decision limiting *Bivens* actions is grounded primarily in public policy considerations, two of which are especially pertinent to this case. First, the *Meyer* Court refused to expand the category of defendants in *Bivens* actions to include more than federal agents because "the purpose of *Bivens* is to deter *the officer.*" *Meyer*, 510 U.S. at 485, 114 S.Ct. at 1005, 127 L.Ed.2d at 323. The Court reasoned that, if it were to imply a *Bivens* action directly against federal agencies, there would be no reason for aggrieved parties to bring damages actions against individual officers. Consequently, the deterrent effects of the *Bivens* remedy would be lost. *Id.*

■ In this case, all the acts that form the basis for Drummonds' constitutional tort claims were actually committed by federal agents—RTC employees Taylor, Crain, Roach, and Bodak. Drummonds does not complain of a single act by an AccuBanc officer or employee who was a nongovernment official, yet he has sued only AccuBanc.[5] If a private corporation such as AccuBanc is an available defendant in a *Bivens* action (often with deeper pockets than indi-

vidual offenders), plaintiffs might make the same choice as Drummonds, who brought his *Bivens* action only against the private entity and not against the individual federal agents. Thus, on *Meyer*'s deterrence rationale, there is no affirmative reason to recognize *Bivens* actions against private entities, and there is some reason not to do so.

The *Meyer* Court also refused to allow *Bivens* actions against federal agencies because recognizing a direct action for constitutional tort damages against federal agencies would create an enormous financial burden for the federal government. *Meyer*, 510 U.S. at 485–86, 114 S.Ct. at 1005–06, 127 L.Ed.2d at 323–24. Recognizing a *Bivens* action under the circumstances of this case would likewise create an enormous financial burden for the federal government. Drummonds made no effort to hide the fact that the government, i.e., the RTC, would bear the burden of any damages award against AccuBanc. To the contrary, he emphasized this fact.

It is undisputed that, when Drummonds was discharged and filed his lawsuit, the RTC was on the verge of selling AccuBanc as an asset of its failed parent, El Paso Savings. Over AccuBanc's repeated objections, Drummonds was (1) allowed to admit "evidence"[6] that the RTC had indemnified AccuBanc so the sale could go through and (2) to argue in both opening and closing arguments that the jury should return a large damages award for Drummonds to "teach the RTC a lesson."

In effect, Drummonds' lawsuit against AccuBanc presented the government with a Hobson's choice between (1) indemnifying AccuBanc's prospective purchasers with federal guarantees, as in this case, (2) selling AccuBanc for a reduced value based upon its potential liability, or (3) simply not selling AccuBanc at all. Any one of these alterna-

---

4. The term "state action" is used in *Bivens* cases to indicate federal governmental action. *See Reuber*, 750 F.2d at 1054 n. 19.

5. Even in *Dobyns*, upon which Drummonds so heavily relies, the actions that formed the basis of the plaintiffs' *Bivens* action were committed by E–Systems employees rather than government officials. *See Dobyns*, 667 F.2d at 1221.

6. Actually, the "evidence" was inadmissible hearsay. Drummonds was allowed to testify that AccuBanc's pleadings stated the RTC had agreed to indemnify AccuBanc. However, neither the pleadings nor the alleged indemnity agreement was ever offered or admitted into evidence. At the same time, the trial court prohibited AccuBanc from mentioning or putting on evidence that any judgment in the case would be paid by U.S. taxpayers or with tax money.

tives would have reduced the return to the federal treasury from the liquidation of El Paso Savings' assets, thereby frustrating the RTC's congressionally mandated function of realizing on those assets. In turn, the federal treasury would have had to provide more of the funds necessary to pay El Paso Savings' depositors' federally insured claims.

Without question, recognizing a *Bivens* action against the asset of a failed thrift that is being liquidated in receivership would create an enormous financial burden for the federal government. Accordingly, as in *Meyer,* these "special factors counsel[ ] hesitation" in the creation of such a remedy. *Meyer,* 510 U.S. at 486, 114 S.Ct. at 1005–06, 127 L.Ed.2d at 323 (citing *Bivens,* 403 U.S. at 396, 91 S.Ct. at 2004, 29 L.Ed.2d at 626).

Indeed, Drummonds' constitutional tort claims are, at their heart, the very type of *Bivens* action that the *Meyer* court refused to recognize. Noting that the government expends significant resources indemnifying federal employees who are sued under *Bivens,* Meyer argued that these funds should be shifted to cover the direct liability of federal agencies. *Meyer,* 510 U.S. at 486, 114 S.Ct. at 1006, 127 L.Ed.2d at 323. The *Meyer* Court rejected this argument because decisions involving federal fiscal policy are for Congress to make, not the courts. *Id.,* at 486, 114 S.Ct. at 1006, 127 L.Ed.2d at 324. In this case, Drummonds essentially asks this court to rule that government funds, which could have been used to indemnify the RTC employees had they been sued, may be shifted to cover AccuBanc's liability. The United States Supreme Court left this type of federal fiscal policy decision to Congress; we cannot do otherwise.

Because the purpose of a *Bivens* action is to deter federal officials, not private entities, and because recognizing a *Bivens* action in the circumstances of this case would create an enormous financial burden for the federal government, we hold no *Bivens* action is available against AccuBanc.

### 2. State Constitutional Tort Claims

 We also hold that Drummonds is not entitled to sue AccuBanc for alleged violation of his state constitutional rights. "[T]here is no state constitutional tort" in Texas. *City of Beaumont v. Bouillion,* 896 S.W.2d 143, 149 (Tex.1995). The Texas constitution does not imply a right of action for damages akin to a *Bivens* action, nor do Texas statutes provide a corollary to 42 U.S.C. § 1983. *Id.* at 148–49. In addition, Texas does not recognize a common law cause of action for damages for alleged violation of state constitutional rights. *Id.* at 150.

Because no *Bivens* action is available against AccuBanc, and because "there is no state constitutional tort," the trial court should not have submitted Questions 4, 5, 7, or 8 to the jury. We sustain point of error eight.

### JURY QUESTION 9

In point of error nine, AccuBanc contends the trial court abused its discretion by submitting Question 9 to the jury because none of the reasons for termination listed in the question gives rise to a cause of action for wrongful termination.

AccuBanc assumes Question 9 pertains to the whistleblower doctrine, a narrow public policy exception to the employment at-will rule. The Texas Supreme Court has held that an employee cannot be discharged if the sole reason for discharge was the employee's refusal to perform an illegal act that the employer had ordered him to commit. *Sabine Pilot Serv. v. Hauck,* 687 S.W.2d 733, 735 (Tex.1985); *Burt v. City of Burkburnett,* 800 S.W.2d 625, 626–27 (Tex.App.—Fort Worth 1990, writ denied).

Question 9 asked the jury whether any one or more of the following was a motivating factor in the decision to terminate Drummonds' employment:

- Drummonds' report to RTC employees or the RTC Inspector General;
- His reports to AccuBanc's board of directors;
- His alleged remarks to local RTC employees;
- His alleged disclosures to the warehouse lenders;
- His alleged remarks to anyone in which he questioned the propriety of the

planned sale of AccuBanc or the alleged conflicts of interest.

AccuBanc argues that this question misstates the law on the whistleblower doctrine because it only inquires about what Drummonds did; it does not ask whether Drummonds was discharged for refusing to perform an illegal act that AccuBanc asked him to commit. Drummonds responds that he is not relying on the whistleblower doctrine to sustain the trial court's judgment. Rather, Drummonds contends Question 9 essentially asked the jury whether he was discharged for exercising his First Amendment right to report his employer's corrupt, unlawful, or unethical conduct. Accordingly, this question is an attempt to recover on another constitutional tort claim for damages against AccuBanc.

In our treatment of point of error eight, we held that Drummonds is not entitled to assert a constitutional tort claim for damages against AccuBanc, under either federal or state law. Consequently, the trial court erred in submitting Question 9 to the jury. We sustain point of error nine.

### DEFAMATION CLAIM

In point of error twelve, AccuBanc contends the trial court abused its discretion by granting Drummonds judgment against AccuBanc on his defamation claim because there is no evidence to support the jury's answer to Question 6.

Question 6 and its accompanying instructions read as follows:

> In answering Question[ ] ... 6, publication occurs if communication made to Mr. Drummonds was made such that Mr. Drummonds himself would be forced to disclose the information to third parties such as prospective employers.
>
> ....
>
> Defamation means making a false statement which tends to injure one's reputation; to diminish the esteem, respect, goodwill or confidence in which one is held.
> **QUESTION NO. 6:**
> Did AccuBanc defame Mr. Drummonds?
> **Answer "Yes" or "No."**
> **Answer:** *Yes.*

In determining a "no evidence" point, we are to consider only the evidence and inferences that tend to support the jury finding and disregard all evidence and inferences to the contrary. *Catalina*, 881 S.W.2d at 297; *In re King's Estate*, 244 S.W.2d at 661–62. If there is more than a scintilla of such evidence to support the finding, the claim is sufficient as a matter of law, and any challenges go merely to the weight to be accorded the evidence. *Browning–Ferris*, 865 S.W.2d at 928.

■■■■ "Defamation" takes two forms: libel and slander. Slander is a false oral statement that is published to a third person without a legal excuse, which refers to an ascertainable person. *Randall's Food Mkts. v. Johnson*, 891 S.W.2d 640, 646 (Tex.1995); *Reeves v. The Western Co.*, 867 S.W.2d 385, 393 (Tex.App.—San Antonio 1993, writ denied). Libel is written or printed defamation. *Rogers v. Dallas Morning News*, 889 S.W.2d 467, 472 (Tex.App.—Dallas 1994, writ denied). Defamatory statements are "published" if they are communicated orally, in writing, or in print to some third person capable of understanding their defamatory import and in such a way that the third person did so understand. *Marshall Field Stores, Inc. v. Gardiner*, 859 S.W.2d 391, 399 (Tex.App.—Houston [1st Dist.] 1993, writ dism'd w.o.j.); *Ramos v. Henry C. Beck Co.*, 711 S.W.2d 331, 335 (Tex.App.—Dallas 1986, no writ).

The defamation issue in this case centers around the reasons for discharge listed in the termination letter Drummonds received. Drummonds contends the reasons for discharge listed in his termination letter were false and therefore defamatory. Drummonds does not contend that AccuBanc communicated these reasons to anyone; rather, he contends he was required to self-publish them in order to secure new employment.

■■■■ Ordinarily, communication of defamatory statements directly to the defamed person, who himself communicates them to a third party, is not publication or, more accurately, self-publication of the defamatory statements. *Doe v. SmithKline Beecham*

*Corp.,* 855 S.W.2d 248, 259 (Tex.App.—Austin 1993), *aff'd as modified on other grounds,* 903 S.W.2d 347 (Tex.1995). Self-publication does occur, however, (1) if the defamed person's communication of the defamatory statements to the third person was made without an awareness of their defamatory nature, and (2) if the circumstances indicated that communication to a third party was likely. *Id.;* RESTATEMENT (SECOND) OF TORTS § 577 cmt. m (1977).

*Doe* involved a situation in which an employer retracted an employment offer because Doe failed a post-offer drug test. *Doe,* 855 S.W.2d at 251. Doe's sample tested positive for opiates, but there was some evidence that this result may have been a false positive. *Id.* at 251–52. Doe sued her prospective employer and the testing laboratory for defamation, claiming that the defendants had placed her in a situation where she felt obligated to disclose to other prospective employers the circumstances of the drug test and the revocation of the employment offer. *Id.* at 258–59.

The Austin Court of Appeals upheld the trial court's ruling that Doe had failed to establish a cause of action for defamation. The evidence showed that Doe immediately knew of the defamatory implications of the drug test results. Thus, she failed to satisfy the first element of the two-part test for self-publication. *Id.* at 259. In this case, the evidence shows that Drummonds immediately knew of the alleged defamatory implications of the termination letter. Thus, he has also failed to satisfy the first element of the self-publication test. Because Drummonds has failed to satisfy this element, he cannot establish a cause of action for defamation. *Id.*

Drummonds relies on *Chasewood Constr. Co. v. Rico,* 696 S.W.2d 439 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.) and *First State Bank v. Ake,* 606 S.W.2d 696 (Tex.Civ. App.—Corpus Christi 1980, writ ref'd n.r.e.). The courts in both of these cases have adopted a pure foreseeability test, holding

that self-publication occurs if the defamed person communicates the defamatory statements to a third party and the surrounding circumstances indicate that the communication was likely. *Chasewood Constr. Co.,* 696 S.W.2d at 445; *First State Bank,* 606 S.W.2d at 701–02. Like the *Doe* case, both of these courts relied on comment m to section 577 to the RESTATEMENT (SECOND) OF TORTS. Inexplicably, however, neither of these courts addressed the first prong of the self-publication test that is set forth in comment m. We decline to follow their example, being more persuaded by the *Doe* opinion, which adopts comment m in its entirety.

Moreover, there is no evidence that the reasons for Drummonds' discharge, as stated in the termination letter, were ever published at all. AccuBanc did not communicate the reasons to anyone other than Drummonds. On the day Drummonds was discharged, RTC representatives presented him a termination letter. The letter was in a sealed envelope, and its contents were neither explained or discussed at the termination meeting. The letter went straight from the RTC to Drummonds. A copy of it was not placed in his personnel file, and even AccuBanc's director of human resources knew nothing about it. Moreover, Drummonds admitted that he knew of no one to whom the letter was given other than himself.

The termination letter lists five important decisions Drummonds allegedly took concerning AccuBanc without the RTC's knowledge or consent:

- Suggesting to those with whom Accu-Banc did business that Merit would take certain action after acquiring AccuBanc;
- Failing to renew, extend, and maintain AccuBanc's line of credit with its warehouse lenders; [7]
- Engaging counsel for material legal representation;
- Firing the lawfirm that had served as AccuBanc's primary outside counsel and mortgage document preparation counsel; and

---

7. AccuBanc was in the mortgage banking business. It made loans to consumers to purchase or refinance homes, sold those loans to investors on the secondary market, and serviced the loans for

the investors. Certain "warehouse lenders" provided AccuBanc credit for the interim period between the closing of the mortgage loans and the time they were sold on the secondary market.

- Engaging a successor lawfirm as primary outside counsel.

The letter then states that Drummonds was discharged because the RTC believed he had acted and would continue to act "on major policy matters in the operation and sale of [AccuBanc]" without first consulting or informing the RTC. Drummonds argues that the reasons for his discharge stated in the termination letter were false.[8] He asserts that he was actually fired for a reason not stated in the letter: because he interfered with the sale of AccuBanc to Merit by expressing to the RTC and others his concerns over the pending sale and by reporting a possible conflict of interest from the sale to the RTC Inspector General.

Notwithstanding, Drummonds asserts that the evidence shows he was required to self-publish the "false" reasons stated in the termination letter to get another job. The record simply does not support this assertion. To the contrary, the evidence shows that Drummonds never detailed the "false" reasons to any prospective employers. Drummonds testified that his first job after being fired as AccuBanc's president was as a consultant to Bank One Mortgage Company. Bank One's job application asked Drummonds if he had ever "been involuntarily terminated." Drummonds stated on the application that he had, but Bank One never asked about the circumstances or details of the termination. Regarding the job he held at the time of trial, Drummonds testified he could not remember what he had said in his interview, although he did remember stating that he had been terminated from employment with AccuBanc.

■ Drummonds further testified that his usual response to questions concerning the reason for his termination was that he had been terminated by the RTC board of directors of AccuBanc for allegedly interfering with the sale of the company. In effect, then, Drummonds' testimony was that he gave prospective employers the true reason for his discharge, not one or more of the allegedly false reasons stated in the letter.

The fact that Drummonds had to tell prospective employers the true reason he believed he was discharged is not evidence of self-publication. Rather, Drummonds was required to show that he had to communicate to prospective employers *one of the allegedly false reasons AccuBanc gave him* for his discharge. Otherwise, Drummonds would not be communicating AccuBanc's statements, but his own opinions.

■ We believe the cases on self-publication support our conclusion. *See Doe,* 855 S.W.2d at 251–52, 258–59 (plaintiff claimed she had to communicate to prospective employers false positive drug test); *Chasewood Constr. Co.,* 696 S.W.2d at 444 (foreseeable that subcontractor would tell his employees general contractor had terminated his contract because of false allegation of his theft); *First State Bank,* 606 S.W.2d at 701–02 (plaintiff required to communicate to prospective employers that former employer had falsely alleged on bond claim that he had been dishonest). In each of these cases, the evidence showed the plaintiff communicated to prospective employers a false statement a previous employer had made about the plaintiff. In this case, Drummonds only communicated what he claims is the truth: that he was discharged for interfering with the sale of AccuBanc. Because there is no evidence that Drummonds communicated to prospective employers any of the "false" reasons stated in the letter, there was no self-publication of defamatory statements. Defamation involves the publication of a false statement of fact about the plaintiff, not a true one. *Randall's Food Mkts.,* 891 S.W.2d at 646 (truth is an affirmative defense to slander); *accord Rogers,* 889 S.W.2d at 472 n. 7 (defamation claim).

■ Drummond also argues that the fact that he was the only member of AccuBanc's senior management who was fired by the RTC was, alone, enough to create the impression that he had done something wrong. Irrespective of whether Drummonds is correct, this fact does not amount to defamation.

---

**8.** Drummonds contends that some, but not all, of the statements in the termination letter are false in and of themselves. He contends that all of the statements are false, i.e., pretextual, reasons for his discharge.

We decline to adopt a rule under which the very act of firing an employee constitutes a defamatory statement that can, in turn, be published to a third party. Publication involves the communication of defamatory *words*, not negative facts. *Marshall Field Stores, Inc.*, 859 S.W.2d at 399.

In short, there is no evidence that Accu-Banc, Drummonds, or anyone else published to a third party the specific, allegedly false reasons for Drummonds' discharge, as stated in the termination letter. Rather, the evidence shows only that Drummonds self-published to prospective employers what he believed was the true reason he was discharged. If Drummonds was actually fired because he interfered with the sale of Accu-Banc, this may go to whether he was fired for good cause, but it is not evidence that he was compelled to communicate to prospective employers the allegedly false statements in the termination letter. Consequently, there is no evidence to support the self-publication element of Drummonds' defamation claim, and the trial court abused its discretion in granting Drummonds judgment against AccuBanc on this claim. We sustain point of error twelve.

## PUNITIVE DAMAGES

In point of error twenty-five, AccuBanc contends the trial court improperly rendered judgment for exemplary damages because there is no evidence of the culpable mental state required for the imposition of exemplary damages. Drummonds counters that the evidence is sufficient to support the jury's finding of malice because:

- AccuBanc knowingly violated Drummonds' first amendment and due process rights;
- AccuBanc consciously ignored Drummonds' stated concerns regarding the sale of AccuBanc; and
- AccuBanc terminated Drummonds' employment.

▬▬▬ We need not consider whether the evidence is sufficient to support a finding of malice because, as we discussed in our treatment of points eight, nine, and twelve, Drummonds is not entitled to recover from AccuBanc under any of the tort theories he has raised. Actual damages sustained from a tort must be proven before punitive damages are available. *Twin City Fire Ins. Co. v. Davis*, 904 S.W.2d 663, 665 (Tex.1995). A party who is not entitled to recover actual tort damages is also not entitled to recover exemplary damages. *Transportation Ins. Co. v. Archer*, 832 S.W.2d 403, 406 (Tex. App.—Fort Worth 1992, writ denied).

Because Drummonds has not proven his entitlement to actual tort damages from AccuBanc, he is not entitled to punitive damages. Thus we need not reach point of error twenty-five.

## TESTIMONY AND JURY ARGUMENT CONCERNING INDEMNITY AGREEMENT

In its second point of error, AccuBanc contends the trial court abused its discretion by admitting testimony and allowing argument regarding an indemnity agreement between the RTC and AccuBanc, causing the rendition of an improper judgment in the case. AccuBanc contends the indemnity agreement was a form of insurance, evidence of which is generally inadmissible under Rule 411 of the Texas Rules of Civil Evidence. Drummonds does not dispute this characterization but counters that the trial court properly admitted evidence of the indemnity agreement, to show the bias of three RTC employees who testified for AccuBanc— Frank Tucker, Dan Crain, and Roseanne Mills.

▬▬▬ The trial court allowed Drummonds to testify, over AccuBanc's objections, that AccuBanc's pleadings "state that RTC is indemnifying AccuBanc as to this lawsuit." Because neither AccuBanc's pleadings nor the alleged indemnity agreement were offered into evidence, this testimony is inadmissible hearsay. TEX.R.CIV.EVID. 801, 802.

Further, despite AccuBanc's repeated objections and motions for mistrial, the trial court allowed Drummonds' trial counsel to remind the jury of the indemnity agreement on three separate occasions and urge the jury to return a verdict favorable to Drummonds because the RTC would pay the judgment and should be taught a lesson.

First, during opening arguments, Drummonds' attorney argued:

> We're going to show you that the connection between AccuBanc and RTC is going on at this very moment in this courtroom and that indeed when Mr. Harry[9] told you during voir dire yesterday that AccuBanc didn't even fire [Drummonds], that RTC did, that in fact Mr. Harry is here today under a written agreement with RTC and that RTC is Mr. Harry's client and that he is here to officially represent AccuBanc and that AccuBanc has a written agreement with RTC that RTC will indemnify AccuBanc.

Second, during closing arguments at the trial on liability, Drummonds' attorney argued to the jury:

> And so the insidious character assassination on Rick Drummonds continues to this moment. They will not stop. Because RTC is indemnifying AccuBanc in this case RTC has got to get you to say:
>
> "Oh, AccuBanc didn't do it. RTC did."
>
> . . . .
>
> Oh, yes, it's in evidence, as I told you in my opening statement, that RTC is indemnifying AccuBanc from this lawsuit. And so RTC can send the lawyer in here and say:
>
> "Blame it on RTC."
>
> Then they'll say:
>
> "AccuBanc is not at fault and therefore RTC doesn't have to indemnify them from anything."
>
> That's a neat trick. It won't work because we got into evidence the fact that RTC is indemnifying AccuBanc from this claim.
>
> . . . .
>
> You simply must not allow the RTC, protecting its indemnification agreement, to come in here now, make up totally new stories and grounds and dilute what we, after two years, have been able to prove, that they simply fired him falsely, wrongfully, and in violation of the Constitution and to his everlasting injury. It is time

for us now to look within ourselves and see if we have the courage to stand up and say:

> "We're not going to let RTC get away with this."

Third, before the jury deliberated on exemplary damages, Drummonds' counsel argued:

> [U]nless that message is sent to and through AccuBanc then all of the Danny Crains out there who have that enormous power, is on the board of directors at four hundred and fifty other corporations that RTC is controlling, how many times is he or are those with him going to do this kind of thing? Now is the time and your opportunity to send the message through AccuBanc that we don't tolerate that kind of unconstitutional conduct.
>
> It has to be a very substantial figure to get the attention of either AccuBanc or any other huge well endowed or indemnified organization.
>
> You've heard the evidence that there is the indemnity agreement from the RTC, and I'll ask you to keep that in mind[.]
>
> . . . .
>
> [A]nd I'll ask you to keep that in mind in setting this amount of exemplary damages.

The decision to admit or exclude evidence is within the trial court's discretion. Review of a trial court's action under the abuse of discretion standard is a question of law. *Jackson v. Van Winkle,* 660 S.W.2d 807, 810 (Tex.1983). The test is whether the court acted without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986); *Craddock v. Sunshine Bus Lines,* 134 Tex. 388, 133 S.W.2d 124, 126 (1939). Another way of stating the test is whether the act was arbitrary or unreasonable. *Downer,* 701 S.W.2d at 242.

The theory behind the rule of exclusion incorporated into rule 411 is that a jury is more apt to render a judgment against a defendant and for a larger amount if it knows that the defendant is protected by insurance. *Myers v. Thomas,* 143 Tex. 502, 186 S.W.2d

---

9. Mr. Harry was AccuBanc's trial counsel.

811, 813 (1945); *Barrington v. Duncan,* 140 Tex. 510, 169 S.W.2d 462, 465 (1943); *Kendrix v. Southern Pac. Transp. Co.,* 907 S.W.2d 111, 113 (Tex.App.—Beaumont 1995, writ denied). Drummonds' jury argument was designed to induce the jury to render judgment against AccuBanc and for as large an amount as possible—the very things rule 411 is meant to protect against. Thus, we strongly question whether the trial court's decision to allow the jury argument was a proper exercise of its discretion. Nonetheless, as we have previously discussed in this opinion, there is sufficient evidence from which the jury could have found that Accu-Banc agreed not to fire Drummonds for twelve months after July 29, 1992 except for good cause. Drummonds' salary was $177,-100 per year, he was fired in August 1992, and the jury awarded him $152,000 on his breach of contract claim. In light of the evidence and the jury's finding of less than $177,100, we do not believe the evidence of the indemnity agreement likely caused the rendition of an improper judgment on Drummonds' breach of contract claim. TEX. R.APP.P. 81(b)(1); *Beall v. Ditmore,* 867 S.W.2d 791, 795 (Tex.App.—El Paso 1993, writ denied). We need not consider the effect of the trial court's rulings on the remainder of the judgment, because we are reversing and rendering that Drummonds take nothing on those claims. We overrule point of error two.

## CONCLUSION

In light of our holdings with regard to points of error one, two, three, seven, eight, nine, and twelve, we need not consider AccuBanc's remaining points of error. We affirm the trial court's judgment with respect to Drummonds' breach of contract claim. We reverse the remainder of the trial court's judgment and render judgment that Drummonds take nothing on his other claims against AccuBanc. We remand the case to the trial court for recalculation of interest and entry of judgment on the breach of contract claim. The parties shall bear equally the costs of this appeal.