Gayleen BONEY, Plaintiff,

v.

Walter VALLINE, Defendant.

No. 3:05–cv–00683–RCJ–VPC.

United States District Court,
D. Nevada.

Jan. 22, 2009.

Mitchell C. Wright, Wright Law Offices, Paul J. Malikowski, Law Office of Paul Joseph Malikowski, Reno, NV, for Plaintiff.

Charles R. Zeh, Zeh Saint–Aubin Spoo, Reno, NV, for Defendant.

## ORDER

ROBERT C. JONES, District Judge.

Before the Court is Defendant Officer Walter Valline's Motion for Summary Judgment. (# 52). Plaintiff Gayleen Bo-

ney filed the present lawsuit against Defendant, seeking damages for Defendant's alleged violation of her First and Fourth Amendment rights in connection with her arrest and son's death, which occurred on July 15, 2004. Having considered the parties' papers, relevant legal authority, and the record in this case, the Court GRANTS Defendant's motion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On April 20, 2004, Defendant began employment as a Walker River Tribal Police Officer, which provides law enforcement services on the Walker River Paiute Tribal Reservation (the "Reservation"). (# 53, Ex. 8, Valline Aff. ¶ 2). The Walker River Paiute Tribe (the "Tribe") is a federally recognized tribe. (# 52, Ex. 8, Reymus Aff. ¶ 2). Within the first few months of Defendant's employment, Defendant had several encounters with Plaintiffs family.

On April 21, 2004, Defendant and Chief Dean Pennock, who was Police Chief of the Tribe at that time, were summoned to apprehend Plaintiff's ex-husband, Norman Boney, Sr., who was drunk and belligerent. (# 52, Ex. 6, Pennock Aff. ¶ 6). Although Boney, Sr. was ultimately apprehended, during that encounter, Boney, Sr. tried to escape the officers' custody and punched Defendant in the nose. (*See id.*). On May 30, 2004, Plaintiff submitted a letter to Chief Pennock, alleging that Defendant employed excessive force against her ex-husband on April 20, 2004. (# 19, Ex. E). Chief Pennock determined that during the April 20, 2004 incident, Defendant had conducted himself properly and that the force Defendant had used was warranted under the circumstances. (Pennock Aff. ¶ 7; # 19, Ex. F). As a result, Defendant was not disciplined for this incident. (Pennock Aff. ¶ 10).

On May 29, 2004, Defendant was summoned because Boney, Sr. was reportedly driving drunk around the Reservation. (Valline Aff. ¶¶ 4–5). Defendant found Boney, Sr. driving with two teenage girls, who were later released to their parents. (*See id.*). Defendant, who was accompanied by Officer Elliot, apprehended Boney, Sr. for suspicion of drunk driving. (*See id.*). The officers discovered drug paraphernalia and empty beer bottles in Boney, Sr.'s vehicle. (*See id.*). As a result, Officer Elliot, as the senior officer, determined that the vehicle needed to be impounded. (Valline Depo., 10/25/07, at 199:21–23; 201:15–18).

Melissa Boney, Plaintiff's daughter, telephoned Defendant to request that she be able to pick up the vehicle and that the vehicle not be impounded. (*See id.* at 198–204). Because drug paraphernalia was discovered in the vehicle, however, her request was denied. (*See id.* at 198:5–18). Defendant told Melissa Boney that the vehicle was going to be impounded and that if she showed up at the police station to pick up the car, she would be arrested. (*See id.* at 202–03). Plaintiff's son, Norman "Manny" Boney, Jr., was also on the telephone call. When Defendant warned Melissa Boney to not come down to the station, Manny jumped into the conversation and told Defendant that Manny "would come down [to the police station] and kick [his] fucking ass if [Defendant] didn't give her the truck." (*See id.* at 204:9–19). Defendant later had a 3–way telephone conversation with Plaintiff, Melissa Boney, and Manny. (Valline Depo., 12/11/07, at 94–95). According to Plaintiff, Defendant threatened Manny during the second telephone conversation by telling Manny, "I'll come and drug test you right now!" (# 19, Ex. E). In her May 30, 2004 letter, Plaintiff also complained about the manner in which Defendant handled himself in his telephone conversations with herself and her children. (*See id.*). Chief Pennock found Plaintiff's complaint about

the telephone calls to be "wanting" and that it did not warrant any discipline. (Pennock Aff. ¶¶ 9–10).

On June 10, 2004, Defendant was dispatched to the residence of Boney, Sr. (Valline Aff. ¶ 6). Boney, Sr. was found unconscious and was taken away by medical personnel. Medical records revealed that Boney, Sr. had passed out from alcohol consumption. (# 52, Ex. 2). During this incident, Plaintiff arrived at Boney, Sr.'s residence. Because there was a restraining order between Plaintiff and her ex-husband, Defendant warned Plaintiff that she would violate the restraining order if she approached Boney, Sr. and that he would have to arrest her. (Gayleen Boney Depo., 9/17/07, at 149:17–151:2). Plaintiff became upset and told Defendant to go ahead and do it. (*See id.*). As a result, Defendant handcuffed Plaintiff and placed her in the back of his squad car for approximately twenty minutes. (*See id.*). Plaintiff did not submit a complaint about this incident. (*See id.* at 154:23–25; 155:1–16).

On July 15, 2004, Defendant responded to a call from Plaintiff in which Plaintiff expressed concern that Boney, Sr. was driving drunk on the Reservation and that she did not want the vehicle to be impounded if Boney, Sr. was arrested. (*See id.* at 140:20–142:2). Chief Pennock sent Defendant to address the matter, as driving intoxicated on the Reservation was a violation of tribal law. (Pennock Aff. ¶ 17). Defendant contacted Officer Yocum for assistance. (Valline Depo., 12/11/07, 122:3–20). Besides Chief Pennock, Defendant and Officer Yocum were the only officers on duty at that time. (Yocum Aff. ¶ 3; Pennock Depo. at 183–84; Valline Depo., 12/11/07 at 111:16–20).

Upon arriving at the residence, Defendant observed that both Boney, Sr. and Manny were present. (Valline Depo., 12/11/07, 123:25–125:5). Boney, Sr. appeared to be intoxicated. Upon Defendant's arrival, Manny became angry and started yelling at Defendant. Melissa Boney and a friend, Charissa Dunnett, also arrived at the residence shortly after Defendant's arrival. (Dunnett Depo. at 35–36). The details of what happened are in dispute, but soon after Defendant arrived at the scene, Defendant employed deadly force against Manny, shooting Manny multiple times. (Dunnett Depo. at 55–65; Valline Depo., 12/11/07 at 123–35).

Shortly after Defendant employed deadly force against Manny, Plaintiff arrived upon the scene. Upon seeing her son injured and on the ground, she became emotional and angry. (Valline Depo., 12/11/07, at 135). Plaintiff began to berate Defendant while at the same time trying to tend to her son. Defendant pointed his gun at Plaintiff and told her to get back. (Valline Depo., 12/11/07, at 135). Officer Yocum and Chief Pennock then arrived. (*See id.* at 135–36). Plaintiff was yelling at Plaintiff, calling the officers killers, and threatening the officers. (Yocum Aff. at ¶ 12). To prevent the escalation of a conflict between Plaintiff and Defendant and to calm down Plaintiff, Chief Pennock, with the assistance of Officer Yocum, restrained Plaintiff and placed her in the rear of Defendant's squad car. (*See id.* at 140:3–7, 141, 142:1–8). Because of her anger at Defendant, Pennock ordered Defendant to stay away from Plaintiff. (Pennock Depo. at 201:1–12).

On December 19, 2005, Plaintiff filed her Complaint against Defendant (# 1), which she subsequently amended (# 19). Plaintiff has brought two claims against Defendant. First, Plaintiff has alleged that Defendant violated her First Amendment rights by retaliating against her by shooting her son Manny in response to her complaints about Defendant's conduct. Second, Plaintiff alleges that Defendant

violated her Fourth Amendment rights by unlawfully arresting her. On January 18, 2007, the Court denied Defendant's Motion to Dismiss (# 27). On March 11, 2008, Defendant filed his Motion for Summary Judgment. (# 52).

## II. MOTION FOR SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In support of its motion for summary judgment, the moving party need not negate the opponent's claim. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The moving party will be entitled to judgment if the evidence is not sufficient for a jury to return a verdict in favor of the opponent. *See Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

When a properly supported motion for summary judgment has been presented, the adverse party "may not rely merely on allegations or denials in its own pleading." Fed.R.Civ.P. 56(e). Rather, the nonmoving party must set forth "specific facts" demonstrating the existence of a genuine issue for trial. *Id.*; *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. A party cannot create a genuine issue for trial by asserting "some metaphysical doubt" as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Nor can a party create a genuine issue of material fact by merely discrediting the testimony proffered by the moving party, which does not usually constitute a sufficient response to a motion for summary judgment. *See Anderson,* 477 U.S. at 256–57, 106 S.Ct. 2505.

To survive a motion for summary judgment, the adverse party must present affirmative evidence, which "is to be believed" and from which all "justifiable inferences" are to be favorably drawn. *Id.* at 255, 257, 106 S.Ct. 2505. When the record, however, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, summary judgment is warranted. *See Miller v. Glenn Miller Prod., Inc.,* 454 F.3d 975, 988 (9th Cir.2006); *see also Beard v. Banks,* 548 U.S. 521, 529, 126 S.Ct. 2572, 165 L.Ed.2d 697 (2006) ("Rule 56(c) 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548)).

## III. ANALYSIS

This case asks the Court to determine whether a tribal officer who violates the constitutional rights of a tribal member in the course of enforcing tribal law can be subject to liability under *Bivens,* which is a case of first impression in this Circuit.

### A. Federal Actor Status Under Self–Determination Contract

A plaintiff alleging a constitutional violation by a federal actor has a right of action under *Bivens v. Six Unknown Fed. Narcotic Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). In *Bivens,* the Supreme Court held that federal officers who acted under color of law were liable for damages caused by their viola-

tion of the plaintiff's Fourth Amendment rights. *See id.* at 389, 91 S.Ct. 1999. Under *Bivens,* a plaintiff may sue a federal officer in his or her individual capacity for damages for violation of the plaintiff's constitutional rights. *See id.* at 397, 91 S.Ct. 1999. To state a claim under *Bivens,* Plaintiff must allege: (1) that a right secured by the Constitution of the United States was violated, and (2) that the alleged violation was committed by a federal actor. *See Van Strum v. Lawn,* 940 F.2d 406, 409 (9th Cir.1991) (42 U.S.C. § 1983 and *Bivens* actions are identical save for replacement of state actor under § 1983 by federal actor under *Bivens* ).

■ Plaintiff has alleged that Defendant violated her First Amendment and Fourth Amendment rights. It is long settled "that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions ... for speaking out." *Hartman v. Moore,* 547 U.S. 250, 256, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006); *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (government officials may not punish a person or deprive him or her of a benefit on the basis of his or her "constitutionally protected speech"). Plaintiff alleges that in response to Plaintiff's expression of her dissatisfaction with Defendant's conduct, Defendant retaliated against her by killing her son. The Fourth Amendment of the United States Constitution protects against unreasonable searches and seizures. *See* U.S. Const. Amend. IV. "The fundamental principle 'of the Fourth Amendment is reasonableness.'" *Morgan v. U.S.,* 323 F.3d 776, 780 (9th Cir.2003). "The Fourth Amendment insists that an unreasonable search or seizure is, constitutionally speaking, an illegal search or seizure." *Hudson v. Michigan,* 547 U.S. 586, 608, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006). Plaintiff alleges that while she was trying to assist her wounded

son, Defendant unlawfully restrained and arrested Plaintiff.

However, for Defendant to be liable under *Bivens,* Plaintiff must prove that Defendant was a federal actor at the time of the disputed events that occurred on July 15, 2004. Defendant was not a federal government employee at the time of the disputed incident. On July 15, 2004, Defendant was employed by the Walker River Paiute Tribe's Police Department. (Valline Aff. ¶¶ 1–2).

■ Nonetheless, even if Defendant was not directly employed by the federal government, Defendant may still qualify as a federal actor for purposes of *Bivens* liability. In the Ninth Circuit, "the private status of the defendant will not serve to defeat a *Bivens* claim, provided that the defendant engaged in federal action." *Schowengerdt v. General Dynamics Corp.,* 823 F.2d 1328, 1337–38 (9th Cir.1987) (private status is not alone sufficient to counsel hesitation in implying damages remedy when private party defendants jointly participate with government to sufficient extent to be characterized as federal actors). In other words, *Bivens* liability may be applicable to constitutional violations committed by private individuals, but only if they act "under color of federal law," or are "federal actors." *Sarro v. Cornell Corrections, Inc.,* 248 F.Supp.2d 52, 59 (D.R.I. 2003).

Plaintiff argues that Defendant acted as a federal actor or under the color of federal law when he shot Plaintiff's son because of the Tribe's contractual relationship with the federal government. Earlier in this case, the Court denied Defendant's Motion to Dismiss on this issue and held that Plaintiff had made sufficient allegations of Defendant's status as a federal actor. However, what suffices as an *allegation* to withstand a motion to dismiss does not necessarily suffice as *evidence* to withstand

a motion for summary judgment. Plaintiff, as the nonmoving party, "may not rely on the mere allegations in the pleadings in order to preclude summary judgment," but must set forth by affidavit or other appropriate evidence "specific facts showing there is a genuine issue for trial." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987). The nonmoving party may not simply state that it will discredit the moving party's evidence at trial; it must produce at least some "significant probative evidence tending to support the complaint." *Id.*

■ The Indian Self–Determination and Education Assistance Act of 1975 ("ISDEAA"), Public Law 93–638, authorizes federal agencies to contract with Indian tribes to provide services on the reservation. *See* 25 U.S.C. §§ 450–450n. Such a contract is commonly referred to as a "self-determination contract" or "638 contract." A "self-determination contract" is a contract "between a tribal organization and the [Federal Government] for the planning, conduct and administration of programs or services which are otherwise provided to Indian tribes and their members pursuant to Federal law." 25 U.S.C. § 450b(j). "Congress enacted the ISDEAA to encourage Indian self-determination and tribal control over administration of federal programs for the benefit of Indians, by authorizing self-determination contracts between the United States, through the Secretaries of the Interior and of Health and Human Services, and Indian tribes." *Demontiney v. U.S. ex ret. Dept. of Interior, Bureau of Indian Affairs,* 255 F.3d 801, 806 (9th Cir.2001). There are several categories of contractible services or programs called out by the statute, one of which concerns the provision of a police force and related law enforcement functions on Indian lands. 25 U.S.C. § 450f(a)(1)(B). Congress thus recognized that one of the ways to further Indian self-

determination was to allow a tribe to contract for law enforcement services so the tribe could maintain a tribal police force on the reservation capable of effectively enforcing criminal laws.

■ On July 15, 2004, the Tribe was in a contract with the Bureau of Indian Affairs ("BIA") to provide law enforcement on the Reservation under a self-determination contract or 638 contract. (# 15, Ex. A). Courts have held that a private actor's conduct may be considered that of the federal government where the private actor and federal government enjoyed "a symbiotic relationship." A symbiotic relationship occurs when the government has "so far insinuated itself into a position of interdependence with [a private entity] that it must be recognized as a joint participant in the challenged activity." *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 725, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). In *Burton,* the Supreme Court considered whether a restaurant's refusal to serve the plaintiff because of his race could fairly be attributed to the public entity that owned the building that housed the restaurant. 365 U.S. at 723, 81 S.Ct. 856. In finding state action, the Court stressed that the restaurant was located on public property and that the rent from the restaurant contributed to the support of the public building. *See id.* Also, "[u]pkeep and maintenance of the building, including necessary repairs, were responsibilities of the Authority and were payable out of public funds." *Id.* at 724, 81 S.Ct. 856. The Court was further convinced of state action by the argument that the restaurant's profits, and hence the state's financial position, would suffer if it did not discriminate based on race. *See id.*

Similarly, in *Halet v. Wend Inv. Co.,* 672 F.2d 1305 (9th Cir.1982), the Ninth Circuit found sufficient evidence of state action where the county leased land to a private

entity who owned and operated an apartment complex on the land. 672 F.2d at 1310. The Ninth Circuit found a symbiotic relationship between the county and the owner based on the fact that the county owned the land and had developed it using public funds, the county leased the land to the owner for the benefit of providing housing to the public, and the county controlled the use and purpose of the apartment, as well as the rent the owner could charge, a percentage of which was paid to the county. *See id.*

Subsequent courts that have considered the definition of a symbiotic relationship, however, have narrowed the scope and application of *Burton.* In *Rendell–Baker v. Kohn,* 457 U.S. 830, 842, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), the Supreme Court rejected a symbiotic relationship argument because, although the state and private school were in a mutually beneficial relationship, there was no showing that the state derived any benefit from the challenged activity (*i.e.,* the termination of school personnel). 457 U.S. at 842–43, 102 S.Ct. 2764. In distinguishing *Burton,* the Court emphasized that there was evidence that the state in *Burton* actually "profited from the restaurant's discriminatory conduct." *Id.* at 843, 102 S.Ct. 2764. The *Rendell–Baker* court found no such connection between the benefit conferred to the state by the school and the challenged activity, and thus no symbiotic relationship. *See id.*

In *Morse v. N. Coast Opportunities, Inc.,* the Ninth Circuit adopted and expounded on the Supreme Court's decision in *Rendell–Baker,* finding "that governmental funding and extensive regulation without more will not suffice to establish governmental involvement in the actions of a private entity." 118 F.3d 1338, 1341 (9th Cir.1997) (citing *Rendell–Baker*). The *Morse* court noted that *Burton's* symbiotic relationship test requires additional evidence of interdependence, such as "the physical location of the private entity in a building owned and operated by the State, and a showing that the State profited from the private entity's discriminatory conduct." *Morse,* 118 F.3d at 1341.

In *Morse,* the Ninth Circuit held that a Head Start parents' council was not liable for alleged federal constitutional violations in approving an employee's termination because the actions were not fairly attributable to the federal government. *See id.* at 1342–43. Although the federal government was involved in the Head Start program through significant funding and regulations governing the operation of the program, according to the Ninth Circuit, governmental funding and extensive regulation, without more, was not sufficient to establish governmental involvement in the actions of a private agency. *See id.* The Court arrived at its decision by applying the analysis articulated by the *Rendell–Baker* court, which considered four factors to determine whether government action was implicated in the private conduct of the school council:

> (1) the source of the school's funds; (2) the impact of governmental regulations on the conduct of the private employer; (3) whether the private actor was performing a function that is traditionally the exclusive prerogative of the government; and (4) whether a symbiotic relationship existed between the private actor and the government.

*Id.* at 1342.

 Applying the *Rendell–Baker* factors to the evidence presented to the Court, the Court holds that Defendant was not acting under the color of federal law at the time that he used deadly force against Plaintiffs.son. Under its 638 contract, the Tribe received funding for its law enforcement activities, and the Department of Interior or "DOI" (through the BIA) re-

quired that the Tribe comply with certain recordkeeping and certification requirements. Nonetheless, the Supreme Court and the Ninth Circuit have made clear, in *Rendell–Baker* and *Morse*, that a combination of these two factors is not sufficient to impute federal government action to the conduct of a private or non-federal actor. In *Morse*, the Ninth Circuit observed that the Head Start program was "funded almost exclusively by the federal government," yet the Ninth Circuit found no governmental action. *Id.* at 1342. Similarly, in *Morse*, the existence of considerable federal regulations touching upon the conduct of the Head Start council did not preclude the Ninth Circuit from finding no governmental action. *Id. See also, Mathis v. Pacific Gas and Elec. Co.*, 75 F.3d 498, 501 (9th Cir.1996) (requiring a showing that federal regulations created the "standard of decision" for the personnel decision of a private entity to be considered governmental action); *Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1486 (9th Cir.1995) (finding that actions of a private entity were not governmental action where no State regulation or policy compelled the offensive action).

The Court in *Rendell–Baker* also considered whether the private entity was performing a function that was "traditionally the exclusive prerogative" of the government. *See Rendell–Baker*, 457 U.S. at 842, 102 S.Ct. 2764. In *Morse*, the Ninth Circuit noted that the Head Start program was educating pre-school children and determined that pre-school education is not a function that is normally carried out by the federal government and as a result, there was no governmental action. 118 F.3d at 1343. Although the enforcement of federal law may "traditionally [be] the exclusive prerogative" of the federal government, the enforcement of a tribe's own tribal laws against members of the tribe is certainly within the scope of the tribe's inherent sovereignty.

The Supreme Court has "repeatedly recognized the Federal Government's longstanding policy of encouraging tribal self-government." *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 14, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987). "This policy reflects the fact that Indian tribes retain 'attributes of sovereignty over both their members and their territory,' to the extent that sovereignty has not been withdrawn by federal statute or treaty." *Id.* (internal citation omitted). The Supreme Court has recognized that "the powers of self-government" include "the power to prescribe and enforce internal criminal laws." *Nevada v. Hicks*, 533 U.S. 353, 378, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001) (citation omitted). *See also, United States v. Wheeler*, 435 U.S. 313, 326, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978) (recognizing that the power to make and enforce criminal laws has been recognized as an exercise of the inherent sovereign powers retained by Indian tribes because the exercise of criminal jurisdiction over tribe members on tribal lands "involve[s] only the relations among members of a tribe [and these] are not such powers as would necessarily be lost by virtue of a tribe's dependent status."). To that end, Indian tribes unquestionably have power to enforce their criminal laws against tribe members. Although physically within the territory of the United States and subject to ultimate federal control, they nonetheless remain "a separate people, with the power of regulating their internal and social relations." *United States v. Kagama*, 118 U.S. 375, 381–382, 6 S.Ct. 1109, 30 L.Ed. 228 (1886). Their right of internal self-government includes the right to prescribe laws applicable to tribe members and to enforce those laws by criminal sanctions. *United States v. Antelope*, 430 U.S. 641, 643 n. 2, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977).

In the present case, Defendant was called to the scene to address Norman

Boney, Sr.'s reported violation of the Tribe's Constitution and Law and Order Code. (*See* Pennock Aff. ¶ 12). Under tribal law, it was illegal to drive on Reservation roads while intoxicated. (*See id.*; *see also,* Reymus Aff. ¶ 5). Defendant went to the scene in response to a report that Norman Boney, Sr. was driving drunk around the Reservation, in violation of tribal law. (*See id.* at ¶ 16). This law was put into place by the Tribe's Tribal Council to govern the relations among the Tribe's members and to ensure their safety. If Defendant had arrived at the scene to enforce federal law, then there might be an argument that his conduct was in the exclusive prerogative of the federal government. *See* 18 USC § 1153 (provides for federal jurisdiction over 14 enumerated crimes committed by "Indians" within "the Indian country" and commonly referred to as the Major Crimes Act). However, Defendant went to the scene to enforce tribal law against a member of the Tribe, which constitutes conduct within the Tribe's inherent sovereignty. In sum, Defendant was not performing a function that was traditionally the exclusive prerogative of the federal government.

Finally, in *Morse,* the Ninth Circuit looked to whether there was a "symbiotic relationship" between the school council and the government. Because there was no evidence that the federal government actually profited from the council's decision to terminate the employee, the Ninth Circuit concluded that there was no "symbiotic relationship." *Id.* at 1343. "Often significant financial integration indicates a symbiotic relationship." *Brunette v. Humane Society of Ventura County,* 294 F.3d 1205, 1213 (9th Cir.2002) (citations omitted). "For example, if a private entity, like the restaurant in *Burton,* confers significant financial benefits indispensable to the government's 'financial success,' then a symbiotic relationship may exist." *Id.* That is clearly not the case here. There is no evidence that the DOI was profiting from the Tribe's provision of law enforcement on the Reservation.

■ Alternatively, "[a] symbiotic relationship may also arise by virtue of the government's exercise of plenary control over the private party's actions." *Id.* (citing *Dobyns v. E–Systems, Inc.,* 667 F.2d 1219, 1226–27 (5th Cir.1982)) (finding symbiotic relationship where the government controlled a private peacekeeping force engaged in a government-directed field mission in the Sinai Peninsula). Such control of the law enforcement activities on the Reservation does not exist here. Under the Tribe's 638 contract, the Tribe was "responsible for managing the day-to-day operations" of the law enforcement activities performed pursuant to the 638 contract. (# 15, Ex. A at 5, ¶ 7(c)). The Tribe provided "all necessary qualified and licensed personnel, equipment, materials and services to perform all tribal law services on the Walker River Paiute Tribe, with the exception of federal violation (major crimes)." (*See id.* at Section C at 12). The Tribe was "responsible for the investigation of all offenses enumerated in the Tribal Law and Order Code, United States Code or 25 CFR as applicable." (*See id.* at Section C at 13). The uniforms donned by tribal officers bore a "tribal patch." (*See id.* at Section C at 12). The Tribe recruited and employed its police officers, who were subjected to Tribal personnel policies and procedures. (*See* Pennock Aff. ¶ 12). Except as specifically agreed between the Tribe and the Secretary of Interior, the Tribe was "not required to abide by [Federal] program guidelines, manuals, or policy directives ...." in carrying out law enforcement activities pursuant to the 638 Contract. (# 15, Ex. A at 11, ¶ 11). In short, by no means did the federal government exercise plenary control over the Tribe's law enforcement activities

and certainly had no intervention with the specific incident that occurred on July 15, 2004 on the Reservation.

■■ Therefore, although the Tribe received considerable funds from the federal government and was required to comply with certain guidelines provided by the federal government in carrying out its responsibilities under the 638 contract, this evidence is insufficient to establish that the federal government and the Tribe had a symbiotic relationship. Furthermore, Plaintiff presented no evidence that Defendant was commissioned as a federal officer. 25 C.F.R. § 12.21(b) states that "[t]ribal law enforcement officers operating under a BIA contract or compact are not automatically commissioned as Federal officers; however, they may be commissioned on a case-by-case basis." Under a 638 contract, the BIA is authorized to delegate the responsibility of enforcing federal law on Indian lands to tribal police. *See Hopland Band of Pomo Indians v. Norton,* 324 F.Supp.2d 1067, 1068 (N.D.Cal. 2004). However, to do so, the BIA must approve and issue federal commissions called "special law enforcement commissions" or "SLECs" to individual tribal officers determined to be qualified on a case-by-case basis. *Id.*

At the time that Defendant was involved with the incident on July 15, 2004, he had only been employed with the Tribe's police force for three months. (*See* Valline Aff. ¶ 2). Plaintiff has presented no evidence that Chief Pennock submitted an application to the BIA for a SLEC for Defendant or that the BIA approved or issued a SLEC for Defendant. According to the Chairman of the Walker River Paiute Tribe, the Tribe's police officers were not cross-deputized by the federal government. (Reymus Aff., ¶ 14). Because 25 C.F.R. § 12.21(b) makes a distinction between tribal law enforcement officers who are commissioned as federal officers and

those who are not, the Court is persuaded that noncommissioned tribal officers such as Defendant, especially when such officers are purely enforcing tribal law, are not acting under the color of federal law.

Additionally, nothing in the ISDEAA, or in relevant case law, suggests that the mere existence of a 638 contract between the BIA and a tribe for the provision of law enforcement services automatically confers federal law enforcement authority upon the officers in tribal police departments. The overwhelming weight of the evidence presented establishes that Defendant was a tribal police officer. Defendant was attempting to enforce tribal law when his encounter with Plaintiffs son took place. Plaintiff has presented no evidence to establish that Defendant was commissioned as a federal officer or that Defendant routinely, or even sporadically, acted to enforce federal law. In sum, Defendant does not qualify as a federal actor for liability under *Bivens.*

At least one circuit agrees with this result. In *Dry v. United States,* 235 F.3d 1249 (10th Cir.2000), Choctaw Nation Tribal officers arrested Native Americans on Choctaw land and charged them with numerous offenses in tribal court. *See id.* at 1251. The tribal members then filed suit against certain law enforcement personnel and asserted constitutional violations under *Bivens* in concert with FTCA claims. *See id.* The district court dismissed all claims against the tribal defendants, including their *Bivens* claims. *See id.* at 1255. On appeal, the Tenth Circuit affirmed the dismissal of the *Bivens* claims. The Tenth Circuit stressed that under *Bivens,* an individual has "a cause of action against a *federal official* in his individual capacity for damages arising out of the official's violation of the United States Constitution *under color of federal law or authority.*" *Id.* (emphasis in original).

The Tenth Circuit held that "the tribal defendants did not act as federal employees or agents, nor did they act under color of federal law." *Id.* Instead, the court concluded they were acting under the Tribe's inherent tribal sovereignty over its own members and stated that "Indian tribes have power to enforce their criminal laws against tribe members." *Id.* at 1254.

## B. Federal Actor Under The Federal Tort Claims Act

Plaintiff argues that because a tribal officer can qualify as a federal employee for purposes of the Federal Tort Claims Act ("FTCA"), then a tribal officer must qualify as a federal employee or actor for all purposes, including for purposes of liability in a *Bivens* cause of action. In 1988, Congress amended the ISDEAA to allow recovery under the FTCA for certain claims arising out of the performance of self-determination contracts, "Congress acknowledged that the tribal governments, when carrying out self-determination contracts, were performing a federal function and that a unique legal trust relationship existed between the tribal government and the federal government in these agreements. Because of this relationship, Congress concluded that the federal government must provide liability insurance to the tribal government for self-determination contracts." *FGS Constructors, Inc. v. Carlow*, 64 F.3d 1230, 1234 (8th Cir.1995).

 Nonetheless, the Ninth Circuit has rejected Plaintiff's argument. In *Snyder v. Navajo Nation*, 382 F.3d 892 (9th Cir.2004), law enforcement officers of the Navajo Nation Division of Public Safety filed actions against both the Navajo Nation and the United States claiming violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219. *See id.* at 894. The Court of Appeals upheld the dismissal of the FLSA cause of action on the ground that the plaintiffs' cause of

action was against the Navajo Nation, not the United States. *See id.* at 896. The plaintiffs argued that they were employees of the federal government, and could appropriately bring an FLSA claim against the United States, because they were considered employees for purposes of the FTCA. The Ninth Circuit rejected their argument that the FTCA's qualification of them as federal employees "means they are employees of the BIA for all purposes," including for purposes of the FLSA. *Id.* at 897. The Ninth Circuit concluded that Congress "did not intend section 314 to provide a remedy against the United States in civil actions unrelated to the FTCA." *Id.* Similarly, a *Bivens* cause of action is not an FTCA cause of action. Hence, the FTCA's definition of tribal officers as federal employees does not automatically qualify tribal officers as federal employees or actors for purposes of *Bivens*.

 Plaintiff's argument must fail for another reason. Although Congress amended ISDEAA to allow recovery under the FTCA for certain claims arising out of performance of self-determination contracts, courts have held that the qualification of a tribal employee as a federal employee or actor under the FTCA is limited. In *Dry*, the Tenth Circuit also held that the United States could not be liable for the tribal defendants' actions under the FTCA. The FTCA allows injured persons to sue for certain torts committed by federal employees while acting within the scope of their office or employment. *See* 28 U.S.C. § 1346. "The purpose of the [FTCA] is to provide a remedy to citizens injured by governmental negligence in circumstances in which the same act of negligence would impose liability under state law, but for governmental immunity." *Kearney v. United States*, 815 F.2d 535, 536 (9th Cir.1987). The FTCA contains

some exceptions to the waiver of sovereign immunity. 28 U.S.C. § 2680. Under the intentional torts exception, the FTCA bars any claim arising out of assault, battery, false imprisonment, or false arrest.

However, there is an "exception to the exception." *Tekle v. U.S.*, 511 F.3d 839, 851 n. 9 (9th Cir.2007). The FTCA does not bar a claim against the United States for intentional torts such as assault and battery where the perpetrator is an investigative or law enforcement officer. Thus, under the intentional torts exception to the FTCA, the general waiver of sovereign immunity effected by the Act only extends to suits for intentional torts such as "assault [and] battery, false imprisonment, false arrest, malicious prosecution, [and] abuse of process" if the conduct of "investigative or law enforcement officers of the United States Government" is involved. 28 U.S.C. § 2680(h). If an intentional tort is committed by one who is not an investigative or law enforcement officer, then sovereign immunity is not waived. An "investigative or law enforcement officer" is defined as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h). In *Dry,* the Tenth Circuit held that because the tribal defendants were acting under authority inherent to the Tribe's sovereignty (*i.e.,* enforcing tribal criminal laws against tribal members), they were not investigative or law enforcement officers for purposes of the FTCA. 235 F.3d at 1258.

The district courts of the Tenth Circuit have followed *Dry.* In *Trujillo v. United States,* 313 F.Supp.2d 1146 (D.N.M.2003), three Isleta Tribal Police officers responded to a call from the plaintiff Erlinda Trujillo, the estranged spouse of Robert Trujillo, Sr., requesting that law enforcement officers come to her residence located on the Pueblo because she believed that her ex-spouse was intoxicated and should not have the children. *See id.* at 1148. The officers took custody of the two minor children and attempted to arrest Mr. Trujillo. The Trujillos later filed an FTCA claim, alleging that the three officers physically attacked and beat Mr. Trujillo.

Despite the existence of a 638 contract with the BIA, the district court concluded that the tribal officers were not "law enforcement officers" of the United States for purposes of the FTCA, *See id.* at 1151. The district court noted that "[n]othing in the ISDEAA, or in relevant case law, suggests that the mere existence of a Public Law 93–638 contract between BIA and a tribe for the provision of law enforcement services automatically confers federal law enforcement authority upon the officers in tribal police departments." *Id.* It further determined that "[a]bsent the power to enforce federal law, tribal officers are not federal investigative or law enforcement officers." *Id.* To determine whether the tribal officers were United States law enforcement officers for purposes of the FTCA, the court noted that the answer depended on "the particular contract under which the services are carried out." *Id.* In particular, the court observed that under the '638 contract, only tribal officers who received special law enforcement commissions could assist the BIA in enforcing applicable federal criminal statutes and that none of the tribal defendants had received such commissions. *See id.* at 1151. *See also, Vallo v. United States,* 298 F.Supp.2d 1231 (D.N.M.2003) (finding that officer was not a federal officer and that the *Dry* decision compelled dismissal).

The Fifth Circuit has agreed with the status of tribal officers under the FTCA. In *Hebert v. U.S.,* 438 F.3d 483 (5th Cir. 2006), a tribal police officer, Wirick, responded to a domestic dispute between two non-Indians at a casino on tribal land.

*See id.* at 484. One of the non-Indians, Hebert, failed to comply with the officer's instruction and a confrontation occurred that resulted in Hebert being injured. *See id.* Hebert filed a FTCA cause of action. In *Hebert*, the Tribe had a 638 contract with the BIA. In fact, in *Hebert*, unlike the present case, the Fifth Circuit observed that the BIA had signed a Deputation Agreement with the Chitimacha Police Department in which the BIA agreed to and did issue a SLEC to Wirick, one of the tribal defendants, cross-deputizing him as a BIA law enforcement officer. *See id.* at 483.

Nonetheless, the Fifth Circuit concluded that neither Wirick nor his chief acted within the scope of federal employment in order for FTCA coverage to attach to Hebert's FTCA claim because "[n]either Wirick nor Vidallia were employed as Bureau of Indian Affairs law enforcement officers or special agents, nor were they acting in accordance with any special commission to assist the Bureau of Indian Affairs with providing law enforcement services." *Id.* at 487. In sum, the record failed to show that the defendants were actually enforcing federal law when they arrested the plaintiff. *See id.* As a result, the Fifth Circuit held that the tribal officers were not acting under the color of federal law, could not be considered "investigative or law enforcement officers of the United States government" for purposes of the FTCA, and the United States had not waived sovereign immunity to be sued for indemnification under the FTCA for the plaintiff's assault and battery claim.

District courts of the Eighth Circuit have arrived at a similar conclusion. In *LaVallie v. U.S.*, 396 F.Supp.2d 1082 (D.N.D.2005), the plaintiff LaVallie filed an FTCA suit against tribal officer William Ebarb for Ebarb's alleged use of excessive force when arresting LaVallie. *See id.* at 1083. In *LaVallie*, the Tribe had a 638 contract with the BIA, which the district court did not find sufficient. *See id.* at 1085. In fact, the United States acknowledged that tribal officers and the BIA worked closely together and that the BIA even provided "direct supervision" for tribal officers and that tribal officers would be trained at the BIA Police Academy, *See id.* at 1086. However, at the time of the alleged assault, Officer Ebarb was attempting to enforce tribal law and LaVallie was ultimately arrested and charged with a variety of tribal offenses. *See id.* As a result, the district court concluded that Officer Ebarb was acting as a tribal police officer and that he did not qualify as a federal officer under the FTCA. *See id.* *See also, Locke v. United States*, 215 F.Supp.2d 1033 (D.S.D.2002) (concluding that despite federal funding to tribe under 638 contract, the tribal officer was not a "federal law enforcement officer" for purposes of the FTCA), aff'd, *Locke v. United States*, 63 Fed.Appx. 971 (8th Cir.2003) (unpublished, per curiam opinion affirming a lower court finding that the officer in question was not acting as a federal law enforcement officer).

One district court in the Ninth Circuit agrees with the courts of the Fifth, Eighth, and Tenth Circuits. In *Washakie v. U.S.*, No. CV–05–462, 2006 WL 2938854 (D.Idaho Oct. 13, 2006), the plaintiff Oren Washakie filed an FTCA suit, alleging that he was assaulted while in the Fort Hall Jail by officers of the Fort Hall Police Department. Relying upon *Dry* and *Hebert*, the court used a two-part legal analysis to evaluate whether a tribal officer constitutes a federal law enforcement officer under the FTCA: "First, a tribal police officer must be certified as a federal law enforcement officer for that officer to come under § 2680(h). Second, the tribal officer must have acted under color of federal law at the time of the alleged tort." *Id.* at *4. Because the evidence demonstrated that

the tribal officers had not been certified by the BIA, the district court held that they were not "investigative or law enforcement officers of the United Stated Government" under 28 U.S.C. § 2680(h). *Id. See also, Cabazon Band of Mission Indians v. Smith,* 388 F.3d 691, 695–96 (9th Cir.2004) (observing that tribal police officers who have received SLECs from the BIA pursuant to a Deputation Agreement with the BIA "are treated as federal employees under the Federal Tort Claims Act.").

Similarly, in the present case, there is no evidence that Defendant was certified or had received a special commission from the BIA. Evidently, not all tribal officers working for a tribe with a 638 contract are required to have SLECs. *See Bob v. U.S.,* No. Civ. 07–5068, 2008 WL 818499, at *2 (D.S.D. Mar. 26, 2008) (holding that even though tribal defendants may be considered federal employees under the FTCA, they were not federal "investigative or law enforcement officers" in light of government's affidavit stating that none of the tribal officers involved in the disputed incident had held the special law enforcement commission from the BIA pursuant to 25 C.F.R. § 12.21(b)). Additionally, Defendant was enforcing the Tribe's laws against the Tribe's members. As a result, Defendant would not qualify as an investigative or law enforcement officer of the United States Government under 28 U.S.C. § 2680(h).

A tribal officer is only considered to be a federal employee for FTCA purposes "[w]hile acting under authority granted by the Secretary [of the Interior]" (*see* 25 U.S.C. § 2804(f)) and a tribal officer is not acting in such capacity when he is enforcing tribal (not federal) law and is doing so without having received a SLEC from the BIA. Thus, Plaintiff's argument fails. In fact, the considerable case law declining to find a tribal officer to be a federal investigative or law enforcement officer under 28

U.S.C. § 2680(h) further bolsters the Court's position that such a tribal officer (at least a tribal officer who does not have a SLEC and is enforcing tribal law) cannot be considered a federal actor for purposes of *Bivens.* The Court's position is also strengthened by Congress's instruction that courts interpret self-determination contracts liberally to benefit Indian contractors. *See* 25 U.S.C. § 450*l*(c) (Section 1 "Purpose"). (*See also,* # 15, Ex. A at 5).

## C. Extension of *Bivens*

The Court's holding is buttressed by the U.S. Supreme Court's position to "respond[ ] cautiously to suggestions that *Bivens* remedies be extended into new contexts." *Correctional Services Corp. v. Malesko,* 534 U.S. 61, 68, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001). Such caution is prudent considering that "[a] *Bivens* cause of action is implied without any express congressional authority whatsoever." *Holly v. Scott,* 434 F.3d 287, 289 (4th Cir. 2006). Since *Bivens,* the Supreme Court has recognized the existence of an implied damages remedy in only two other circumstances. *See Malesko,* 534 U.S. at 61, 122 S.Ct. 515 ("In [over] 30 years of *Bivens* jurisprudence [the Court has] extended its holding only twice."). The Court noted that it first extended *Bivens* to a plaintiff's claim for money damages against a former employer (member of U.S. Congress) for violations of the Due Process clause in *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). The Court emphasized that there were no alternative forms of judicial relief for *Davis,* who, like *Bivens,* was limited to "damages or nothing." *Id.* at 245, 99 S.Ct. 2264 Approximately one year later, in *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980), the Supreme Court held that federal prison officials could be sued for violations of the Eighth Amendment's prohibition on cruel and un-

usual punishment, notwithstanding the availability of a claim under the FTCA against the United States. The Court reasoned that the threat of suit against the United States was insufficient to deter the unconstitutional acts of individuals. *See id.* at 21, 100 S.Ct. 1468.

Since *Davis and Carlson,* however, the Supreme Court consistently has declined to extend *Bivens* liability "to new contexts or new categories of defendants." *Malesko,* 534 U.S. at 68, 122 S.Ct. 515. For example, in *Bush v. Lucas,* 462 U.S. 367, 390, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), the Supreme Court refused to create an implied *Bivens* remedy against government officials for a First Amendment violation in the federal employment context, holding that the "administrative review mechanisms crafted by Congress provided meaningful redress," foreclosing "the need to fashion a new, judicially crafted cause of action." *Id.* (recognizing in *Bush* Congress's institutional competence in crafting appropriate relief as special factor counseling hesitation). *See also, Malesko,* 534 U.S. at 75, 122 S.Ct. 515 (Scalia, J., concurring) (stating that "*Bivens* is a relic of the heady days in which this Court assumed common-law powers to create causes of action-decreeing them to be 'implied' by the mere existence of a statutory or constitutional prohibition" and that he would "limit *Bivens* and its two follow-on cases [*Davis v. Passman* and *Carlson v. Green* ] to the precise circumstances that they involved.").

In *Holly v. Scott,* 434 F.3d 287 (4th Cir.2006), cert. denied, 547 U.S. 1168, 126 S.Ct. 2333, 164 L.Ed.2d 849 (2006), a federal inmate filed a *Bivens* action alleging that prison officials, who were employees of a privately run facility in North Carolina operated by GEO Group, Inc. under contract with the federal Bureau of Prisons, did not properly treat his diabetes and that he was punished when he attempted to obtain medical treatment. *See id.* at 288–89. The Fourth Circuit held that the purpose of *Bivens* was to deter individual "federal officers" from committing constitutional violations and that employees of a private corporation under contract with the federal government were not "federal officials, federal employees, or even independent contractors in the service of the federal government. Instead, they are employed by GEO, a private corporation." *Id.* at 292. The Court emphasized that in the context of constitutional claims raised under 42 U.S.C. § 1983, courts have insisted that as a prerequisite to liability, the "conduct allegedly causing the deprivation of a federal right be fairly attributable to the state." *Id.* (quoting *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)). There was no suggestion in Holly, however, "that the federal government [had] any stake, financial or otherwise, in GEO. Nor [was] there any suggestion that federal policy played in a part in defendants alleged failure to provide adequate medical care, or that defendants colluded with federal officials in making the relevant decisions." *Id.*

The Fourth Circuit expressed its reluctance to extend *Bivens* on the basis that "*Bivens* ... is a judicial creation" without legislative sanction. *Id.* As such, the Court noted that the "danger of federal court's failing to 'respect the limits of their own power' [ ] increases exponentially" with the extension of *Bivens* to such circumstances. *Id.* The Court also recognized the availability of superior causes of action available to plaintiff under the state law of negligence and concluded that the extension of a judicially implied remedy was therefore inappropriate. *See id.* at 295–296.

The Ninth Circuit has similarly recognized *Bivens* to be a limited remedy. *Cas-*

taneda v. U.S., 546 F.3d 682, 688 (9th Cir.2008). A *Bivens* remedy will not lie "in the presence of 'special factors' which militate against a direct recovery remedy." *Id.* For example, "[t]he presence of a deliberately crafted statutory remedial system is one 'special factor' that precludes a *Bivens* remedy." *Id.* at 700 (quoting *Moore v. Glickman,* 113 F.3d 988, 991 (9th Cir. 1997)). Also, the unique nature and structure of the military has been determined to be a special factor prohibiting a *Bivens* action by military personnel for constitutional violations committed by their superiors. *See Chappell v. Wallace,* 462 U.S. 296, 304, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983).

Similarly, in the present case, the Court finds that allowing a *Bivens* action against a tribal law enforcement officer solely on the basis of the an Indian tribe having a 638 contract with the BIA implicates the tribe's inherent sovereignty, which constitutes a special factor militating against extending *Bivens* to this new context. As explained above, the Supreme Court has "repeatedly recognized the Federal Government's longstanding policy of encouraging tribal self-government." *Iowa Mut. Ins. Co.,* 480 U.S. at 14, 107 S.Ct. 971. Given the facts of the present case—a tribal law enforcement officer enforcing tribal law against a tribe member on tribal territory—the extension of *Bivens* to this particular context has dangerous implications for disrupting the long-recognized boundaries between the sovereignty of the United States and that of Indian tribes and disregarding Indian tribes' inherent right of self-government. In tight of these special considerations touching upon an Indian's tribe's sovereignty, the creation of a private right of action against tribal law enforcement officers for civil rights violations committed in the course of conducting tribal business is a decision more appropriately left to legislative judgment. *See Sosa v. Alvarez–Machain,* 542 U.S.

692, 727, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (The Supreme Court "has recently and repeatedly said that a decision to create a private right of action is one better left to legislative judgment in the great majority of cases." (citations omitted)).

A related factor that causes this Court pause in extending *Bivens* to this context is the possibility of an alternate remedial system in the tribal courts. The Indian Civil Rights Act ("ICRA") was passed with the declared purpose "to secur[e] for the American Indian the broad constitutional rights afforded to other Americans." *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 61, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). The ICRA imposes "restrictions upon tribal governments similar, but not identical, to those embodied in the Bill of Rights and the Fourteenth Amendment." *Id.* at 57, 98 S.Ct. 1670. Section 1302 of the ICRA incorporates many of the same rights as found in the Bill of Rights, including the First and Fourth Amendment rights. Specifically, section 1302 states the following:

No Indian tribe in exercising powers of self-government shall—

(1) make or enforce any law prohibiting the free exercise of religion, or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble and to petition for a redress of grievances;

(2) violate the right of the people to be secure in their persons, houses, papers, and effects against unreasonable search and seizures, nor issue warrants, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or thing to be seized.

25 U.S.C. § 1302(1) and (2). "Tribal forums are available to vindicate rights created by the ICRA ... tribal courts have repeatedly been recognized as appropriate

forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians." *Santa Clara Pueblo,* 436 U.S. at 65, 98 S.Ct. 1670.

The Court is not in a position to determine the remedies available to Plaintiff in the Walker River Paiute Tribe's courts. Nonetheless, the ICRA does provide protections analogous to the First and Fourth Amendments, and Plaintiff could possibly have a private cause of action against Defendant for violating these provisions. *See, e.g., Gourd v. Robertson,* 28 Indian L. Rep. 6047, 6048 (Spirit Lake Tribal Ct. 2001) (holding that plaintiff could recover damages on ICRA claim against general manager of tribal casino if plaintiff showed that the defendant "violated a clearly-established right of the plaintiff"); *Johnson v. Navajo Nation,* 14 Indian L. Rep. 6037, 6040 (Nav.Sup.Ct.1987) (stating that "[t]he Navajo courts have always been available for the enforcement of civil rights created by the ICRA and the Navajo Bill of Rights" and noting that the Navajo Nation has enacted laws permitting suit against tribal officials for acting outside the scope of their authority). The availability of obtaining relief in a tribal court clearly does not constitute an alternative remedy that Congress has explicitly declared to be a substitute for recovery under *Bivens* and that is equally effective (*see Castaneda,* 546 F.3d at 688), but the possibility of seeking relief in a matter over which the tribal courts may have jurisdiction goes to the Tribe's sovereignty, a factor that causes the Court hesitation in extending *Bivens* here. *See Iowa Mut. Ins. Co.,* 480 U.S. at 15, 107 S.Ct. 971 (stating that "[t]ribal courts play a vital role in tribal self-government" and that "[a] federal court's exercise of jurisdiction over matters relating to reservation affairs can also impair the authority of tribal courts.").

During oral argument, Plaintiff's attorney, without citing any authority, instruct-ed the Court that Plaintiff filed her cause of action against Defendant in the first instance in federal court because Defendant, being a non-Indian, would certainly have been able to dismiss any cause of action on personal jurisdiction grounds. It is not entirely clear, however, that the Tribe's courts could not exercise jurisdiction over an ICRA or tort cause of action against Defendant, even if a non-Indian.

"[T]he leading case on tribal civil jurisdiction over non-Indians" is *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). *FMC v. Shoshone–Bannock Tribes,* 905 F.2d 1311, 1314 (9th Cir.1990). In *Montana,* the Supreme Court rejected tribal authority to regulate nonmembers' activities on land over which the tribe could not assert a landowner's right to occupy and exclude. *See Montana,* 450 U.S. at 557, 564, 101 S.Ct. 1245. In *Montana,* the Supreme Court specifically addressed the reach of tribal civil jurisdiction over non-Indian parties and found that:

> the Indian tribes retain their inherent power to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members. But exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation.

*Id.* at 564, 101 S.Ct. 1245 (citations omitted). The Court then announced the general principle that "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Id.* at 565, 101 S.Ct. 1245. Nonetheless, the Court decided that Indian tribes do "retain inherent sovereign authority to exercise some forms of civil jurisdiction over non-Indians on their reservations." *Id.*

This jurisdiction arises: (1) when nonmembers "enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements" or (2) when a nonmember's "conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." *Id.* at 565–66, 101 S.Ct. 1245 (citations omitted).

In *Iowa Mutual,* the Supreme Court stated that "Tribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty" and that "[c]ivil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute." 480 U.S. at 18, 107 S.Ct. 971. The Supreme Court has squared this language with *Montana* and related cases, explaining that such language "stands for nothing more than the unremarkable proposition that, where tribes possess authority to regulate the activities of nonmembers, '[c]ivil jurisdiction over [disputes arising out of] such activities presumptively lies in the tribal courts.'" *Strate v. A–1 Contractors,* 520 U.S. 438, 453, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997). Thus, to the extent there is a tribal interest at issue (as defined in the *Montana* exceptions), a tribal court can and probably should exercise jurisdiction over the non-Indian parties.

This Court renders no holding on the issue of the Tribe's courts' exercise of jurisdiction over this matter, but merely notes the possibility that the Tribe could conclude that it has an interest in and jurisdiction over the adjudication of a tribal member's cause of action against a tribal law enforcement officer (even if a non-Indian) for a violation of her rights that the tribal officer committed against her on Indian land in the course of enforcing tribal laws. *See Nevada v. Hicks,* 533 U.S. 353, 358 n. 2, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001) (noting that the Court's "hold-ing in this case is limited to the question of tribal-court jurisdiction over state officers enforcing state law" and that the Court was leaving "open the question of tribal-court jurisdiction over nonmember defendants in general.").

A tribe arguably "possess[es] authority to regulate the activities of nonmembers" who are employed by a tribe's law enforcement department and who are charged with enforcing the tribe's laws against tribal members. *Montana* did recognize that "the power to punish tribal offenders" and "to regulate domestic relations among members" are part of a tribe's retained inherent powers necessary for self-government, which powers were arguably being exercised when Defendant was dispatched to Boney, Sr.'s residence on July 15, 2004. *Montana,* 450 U.S. at 564, 101 S.Ct. 1245. There has been no challenge of jurisdiction here, but these considerations demonstrate why the Court is hesitant to extend *Bivens* to this new context.

Although the denial of Plaintiff's *Bivens* cause of action may leave Plaintiff without redress against Defendant in his personal capacity, at least in a federal court, such ground does not justify the extension of *Bivens* where special factors exist. "The absence of statutory relief for a constitutional violation, for example, does not by any means necessarily imply that courts should award money damages against the officers responsible for the violation." *Schweiker v. Chilicky,* 487 U.S. 412, 421–22, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988). In *Chappell v. Wallace,* 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983), for example, the Supreme Court unanimously refused "to create a *Bivens* action for enlisted military personnel who alleged that they had been injured by the unconstitutional actions of their superior officers," despite the fact that the personnel had no remedy against the government. *Schweik-*

*er*, 487 U.S. at 422, 108 S.Ct. 2460. The Court noted that "the unique disciplinary structure of the Military Establishment and Congress' activity in the field constitute 'special factors' which dictate that it would be inappropriate to provide enlisted military personnel a *Bivens*-type remedy against their superior officers." *Chappell,* 462 U.S. at 304, 103 S.Ct. 2362. *See also, Makah Indian Tribe v. Verity,* 910 F.2d 555, 560 (9th Cir.1990) ("Sovereign immunity may leave a party with no forum for its claims."). Similarly, the Court is persuaded that the unique and delicate nature of the relationship between the sovereignty of the United States and that of Indian tribes is a special factor counseling against extension of *Bivens* to this particular context.

The Court's holding is limited to the particular context now before it. That is, the Court's denial of a *Bivens*-type remedy is limited to a tribal officer who violates a tribal member's rights on tribal lands in the course of enforcing tribal law. The only two instances since *Bivens* in which the Supreme Court has cautiously permitted the extension of *Bivens* involved defendants who were unquestionably federal actors—*Davis v. Passman* involved a United States Congressman and *Carlson v. Green* involved federal prison officials. Based upon the facts of the present case and for the reasons previously explained, the Court cannot conclude that Defendant was a federal actor or acting under the color of federal law during the July 15, 2004 incident. Plaintiff has merely pointed to the existence of the Tribe's 638 contract with the BIA, which contract alone is insufficient to create a genuine issue of material fact that Defendant was acting under the color of federal law on July 15, 2004. In light of this finding and the concerns related to the Tribe's sovereignty and self-government, the Court holds that Plaintiff's First and Fourth Amendment claims cannot be brought against Defendant under *Bivens*.

## CONCLUSION

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment (# 52) is GRANTED.